93        165|
208        66|

## Manners *versus* Philadelphia Library Company.

1. A demurrer does not admit the truth of an averment where the document referred to shows that it is not true.

2. A direction that the trustees of a public library shall not exclude any book because of its differing from the conventional notions on the subjects of theology, morals, medicine, &c., does not avoid the trust; it is a negative recommendation only.

3. A direction to publish certain works which are averred to be atheistic &c., coupled with a gift to found and endow a library, does not avoid the gift; it is not a condition precedent, and if illegal, it will be disregarded.

4. An averment of a refusal to accept a devise by trustees for a charity is immaterial, the bill showing that the time for them to accept or refuse has not arrived.

5. Where a charity is a residuary devisee of land, a purchase by the testator, within thirty days of the testator's decease, though expressly in trust for that charity, passes to the charity as residuary devisee.

6. *Query.* Whether the Act of 1855 sustains a devise for charitable uses against the heir, though the particular object is illegal.

7. A demurrer does not admit evasive or uncertain averments.

February 11th 1880.    Before Mercur, Gordon, Paxson, Trunkey and Sterrett, JJ.    Sharswood, C. J., and Green, J., absent.

Appeal from the Court of Common Pleas, No. 1, of *Philadelphia county*: Of July Term 1878, No. 7.    In Equity.

Robert Manners filed this bill in equity against Henry J. Williams and "The Philadelphia Library Company," contesting the validity of certain alleged trusts and alleged devises in papers, called the will and codicils of Dr. James Rush, deceased.

The bill was filed by an heir-at-law and next of kin of Dr. James Rush, deceased, and asked that the title to the estate of the said James Rush be decreed to be in the complainant, as to his share under the intestate laws; because, 1. The rule was uncertain and impossible of execution, and if possible, immoral and illegal.    2. Because the purchase of a certain lot for the library company, was void under the Act of 1855.    3. Because the codicil of 1867 was a revocation of the will and codicils of 1860 and 1866.    There were some other reasons which are not deemed material.    Copies of the testamentary papers were annexed to the bill.

By his will dated in 1866, Dr. Rush devised the whole of his estate, after payment of debts, annuities and legacies to H. J. Williams, in trust, to select and purchase a lot and erect thereon a building, according to directions to be given by the testator; and upon its completion, to convey the same to the Library Company of Philadelphia, for the uses of their library.    Proviso, that before conveyance, the library company should bind themselves to certain conditions not important to be here stated.    And also, in trust, to assign the residue of the assets to the company, upon certain trusts

as to administration, the surplus income to be applied to the increase and extension of the library.

By the first codicil of 1866, he directed that certain rules for administration should be inserted in the Act of Assembly, which would be required to carry out the provisions of the will. He then added a clause, which is set out in the judgment of the court, on which the charge of immorality turns. And also a clause, directing the devisee, on the refusal of the library company to accept or their failure to comply with the preliminary stipulations, to found and endow a library, with the estate devised to him; and added, that the annuities as they fall in, will be amply sufficient for the legitimate purposes of a library.

He remarked, that he was compelled to make his will by separate instruments, lest by his declaration a month after a formal and harmonious testamentary disposition, it should be avoided.

By a codicil of 1867, he directed, that the whole of his residuary estate should be expended on the purchase of the lot and erection of the building, leaving the library company only a sufficient income to defray ordinary and strictly appropriate expenses. He then directed that every ten years or oftener, editions of his works should be published exactly as he left them. And then declared the library company a trustee for the objects and purposes of his will; and gave certain visitorial powers to a commercial institution in this city and to all citizens.

All these documents were admitted to probate in May 1869. The bill was filed in March 1878. It was on behalf of all the heirs-at-law of Dr. James Rush who would unite. It charged, that the execution of the trusts of the will would be contrary to sound morals and religion, and opposed to the policy of the law. That the library company had declined to accept the trusts, and had no power to do so, and were incompetent. That the direction to found a library in the event of a refusal of the library company to accept, was impossible of execution, as there would be no income, as the whole estate was to be spent in the purchase of the lot and erection of the building; that this direction was a personal trust, and yet required perpetual discretion in management. That the clause (set out in the judgment) compelled the admission of books inculcating rebellion, treason, deism and polygamy (a long catalogue of improprieties), which would be subversive of religion.

The bill then charged, that the codicil of 1867 was a revocation of the will of 1860, and of the codicil of 1866; and no disposition was made of the estate, on the failure of the library company to accept the same. It then charged a purchase by Doctor Rush, within a calendar month of his death, of a lot of ground, which was conveyed upon the charitable uses set forth in the alleged will and codicils. By amendments of the bill it was averred, that the

[Manners *v.* Library Company.]

surplus in the hands of the executor, H. J. Williams, after providing for the annuities and building, exceeded $100,000, and was undisposed of by the codicil of 1867.

And there was a further amendment after the cause had been argued in the court below, averring that the works directed by Dr. Rush to be published every ten years contain infidel and atheistic sentiments, teachings and arguments, and deny the truths of the Christian religion and the existence of God, and that the execution of said trust would be the propagation of infidel and atheistic doctrines and contrary to morals and law. Therefore the residue has become the property of the heirs-at-law.

There was no averment that a building had been erected or a tender of conveyance made to the library, or anything from which it would be inferred that the time had arrived when the corporation could be compelled to elect whether to accept or reject the gift.

Among the grounds of demurrer by the Library Company were these : 1. That by the Act of 1855 (*cy pres* clause), no right remained to the heirs. 2. The bill itself shows there is a fund which the testator says is sufficient to maintain the substituted library. 3. The clause, contrary to morality, is directory only and cannot be construed as compelling the purchase of an illegal publication, and no others can be objected to. 4. If parts of the scheme are impracticable or illegal, the rest will be executed as near to the instruction as possible. 5. The purchase within thirty days by the statute enures to the residuary devisee. 6. The codicil did not revoke the residuary devise to the library, and the omission of the trustee to expend the money cannot deprive the devisee of the benefit. 7. It does not appear that the time for the company to accept or reject has yet arrived. 8. The person on whom all discretionary power rests is still living.

The executor also demurred because it was not shown how the Library Company had debarred themselves from accepting the devise, and if so, how the persons authorized to found a library in the event of a refusal to accept were barred from doing so, and because the Act of April 25th 1855, preserved the property for charitable uses if the devises are void.

(The second amendment was made long after the argument in the court below, and is therefore unnoticed in the demurrer.)

The court below sustained the demurrer.

*F. Carroll Brewster* and *Wm. A. Porter*, for appellants.—[They read extracts from what were asserted to be Dr. Rush's works, to prove their allegations of immorality taught, and also referred to the circumstances connected with the purchase within thirty days of the testator's death, from the report of a case which that gave rise to. None of these facts were on the record, and as the cause was heard on demurrer, these statements are omitted.]

[Manners *v.* Library Company.]

Every fact averred is admitted.   The codicil of 1867 disposing of the *whole* remainder, is a revocation of the previous disposition. The demurrer admits that the devisee has declined to accept, and there is no alternative provision for that event in the codicil.   It also admits the averment of intestacy as to the surplus and accumulations.   The scheme is impracticable, as a shell is provided but no means to fill it.   The scheme of management is personal, and the whole will be impracticable at the death of Mr. Williams.

None of these powers can be executed by a successor: Redf. on Wills, Pt. II., c. 3, sect. 14, p. 10; Ross *v.* Barclay, 6 Harris 179; Waters *v.* Margerum, 10 P. F. Smith 39.

The directions as to the non exclusion of books are imperative, not mere suggestions or wishes which need not be obeyed: Pennock's Estate, 8 Harris 268; Second Reformed Presbyterian Church *v.* Disbrow, 2 P. F. Smith 219; Paisley's Appeal, 20 Id. 153.   As to the nature of the contents of his own works they are admitted on this record.

The effect of this for evil cannot be exaggerated, and that such a trust is void has already been settled: Zeisweiss *v.* James, 13 P. F. Smith 465, which merely follows Updegraph *v.* Commonwealth, 11 S. & R. 394, followed by a series of cases terminating in Mohney *v.* Cook, 2 Casey 342.   This was admitted in Vidal *v.* Girard, 2 How. 127, by Story, J; while we admit no one could have objected to the publications by Dr. Rush himself.

The *cy pres* doctrine has never been so far recognised here as to authorize a diversion of the fund from the particular objects: Theological Seminary *v.* Wall, 8 Wright 355.   The Act of 1855 does not aid this defect.   As to the purchase, the averments are admitted.   It is a mere evasion of the statute to say that the charity is the residuary legatee, and therefore takes the property when the statute (April 26th 1855, § 11) prohibits the gift: McLean *v.* Wade, 5 Wright 266; Price *v.* Maxwell, 4 Casey 23; Miller *v.* Porter, 3 P. F. Smith 292; Schultz's Appeal, 30 Id. 396; Hegarty's Appeal, 25 Id. 503.   It is a mere nullification of the law to let this bill stand dismissed and its sworn maintainers become its executioners.

*W. H. Rawle* and *R. C. McMurtrie*, for the Library Company.— [The executor had died and no one appeared for him, as in fact the property had been handed over by him pending this appeal and accepted by the Library Company.]   There are two cardinal defects in the argument.   1. The *factum* of the will is not open to discussion in this court.   It has no jurisdiction on that question, which is exclusively in the register's court, subject, of course, to an appeal.   And the statute forbids the will as proved being questioned because of lapse of time: 1 Williams on Ex. 405, *et seq.*, and 185; 1 Jarm. 159; Lemage *v.* Goodbau, 1 Prob. &

[Manners *v.* Library Company.]

Div. 57; In the Goods of Petchel, 3 Id. 153. Therefore the only question as to revocation is, whether the codicils revoke by construction or inconsistency. Then the position is, that a subsequent disposition, though ineffectual because it is incomprehensible, impossible or illegal, avoids a prior disposition because of inconsistency. Surely if a gift does not take effect at all, it is impossible to be inconsistent with anything. 2. The assumption is, that the purpose and object of the trust is to publish blasphemy, &c. If the allegations can be noticed at all, *i. e.*, if they are well pleaded, which they are not, the argument ignores the distinction between primary objects and incidental directions. Granting the truth of all the allegations, the trust is to found a library; incidentally the testator wishes a certain class of books not to be excluded and others published. If this cannot be permitted it is because such things are illegal, for there is no other standard of morality for a court. If illegal, the only question is, can the trust be executed without doing anything that is illegal? This has been the uniform rule: Attorney-General *v.* Parsons, 8 Vesey 186; 4 Brown Ch. Rep. 412; 2 Kel. 34, pl. 24; Grimmett *v.* Grimmett, Ambler 210; Williams *v.* Williams, 4 Seld. 525; City *v.* Girard's Heirs, 9 Wright 27–8; Dupre *v.* Thomson, 4 Barb. S. C. 279; Lorillard *v.* Coster, 5 Paige 227. This applies much more when as here there is a devise complete and the objectionable directions are found in a distinct instrument. If effectual they must be legal and binding. If so how can they render the gift void? But it would be a singular spectacle that this court should declare this trust void because the managers are enjoined to admit books which the library of every theological school must have to be competent for the education of the clergy. As to the alleged purchase, the Act of Assembly invoked vests such property in the residuary devisee, and the whole purpose of the act is gained. which is, that there shall be no gifts within thirty days to a stranger to the scheme of distribution, made more than thirty days before death. The want of funds to administer a library will certainly not avoid a gift to put up a building, but the bill shows that this alleged insufficient income will be $12,000 per annum. The allegation of refusal, &c., is met by the fact apparent on the record. The devisees are made a trustee, and are a corporation. The time has not arrived for them to determine to accept, for it is not alleged that a building has been erected and until then there can be no tender and no election. The fact is of course otherwise, but insisting on their allegations they must stand by them. As to the surplus and unexpended estate, the argument really is that the omission of the trustee to spend the money for the benefit of the library as he was directed, works a forfeiture. Apply this to a direction to spend a legacy in building a residence for an infant daughter, and this assuredly becomes apparent.

Mr. Justice PAXSON delivered the opinion of the court, March 1st 1880.

This was a bill in equity filed in the court below by Robert Manners, of London, one of the heirs-at-law of Dr. James Rush, deceased, against Henry J. Williams and The Library Company of Philadelphia. Subsequently Elizabeth Murray Rush, a daughter of James Murray Rush, deceased, and a grand-niece of the said James Rush, upon application to the court below, was allowed to become a party plaintiff. The defendant Williams was the executor of the last will and testament of Dr. Rush, and the defendant corporation was the residuary legatee under his will, and the recipient of nearly the whole of his large estate. The object of the bill, briefly stated, was to recover from the defendants the residuary estate, and the court below was asked to declare that the provisions of the testator's will in regard to the Philadelphia Library were impracticable and impossible of execution, or if capable of execution, that they were contrary to public policy and sound morals, and that the defendant Williams be declared a trustee for plaintiff. The defendants filed separate demurrers, upon which issue was joined. The demurrers were sustained, and the bill dismissed, with costs. It is the appeal from this decree we are now called upon to consider.

We need not dwell at length upon that part of the bill which charges that the provisions of the will are impossible of execution. The argument upon this branch of the case rests upon the fact that the testator, in and by the last codicil to his will, directed that the "whole remainder" of his estate should be expended "in the purchase of a lot and the erection of the library building, construction of book-cases, &c., leaving the said company only an income sufficient to defray the ordinary and strictly appropriate expenses of such an institution." It was urged that here was a direction for the construction of a magnificent shell without any provision to purchase books; that to erect a building of the character indicated, and line its walls with shelves upon which no books could ever be placed, would not be creating a library, but, on the contrary, would defeat the very object the testator had in his mind, and would serve no useful purpose which a court of equity would be under a duty to enforce as against the heir-at-law. It is sufficient to say, by way of answer to this, that the allegation of want of funds to sustain the library is unfounded. The codicil relied on by the plaintiffs provides that the annuities, amounting to $10,400, shall be applied to the support of the library as they shall respectively fall in. In addition, this was the gift of a building to a library company already organized, which had been in existence for many years, and, as we learn from the will of Dr. Rush, with funds and income of its own. The chief object of the

[*Manners v. Library Company.*]

testator was to enlarge the scope of a charity already in existence, not to found a new one. It cannot be seriously contended that the devise of a building to a library company for the safe keeping and convenient use of its books is void or incapable of execution, because unaccompanied with the bequest of a fund to purchase books, pay the taxes, or provide for any of the other expenses of such institutions.

The entire weight of the able arguments on behalf of the plaintiffs was brought to bear upon the single point, that to carry out the provisions of the will of Dr. Rush would be contrary to every principle of good morals and religion, and against the policy of the law; the amended bill expressly charging "that the works directed by the said Dr. James Rush to be published every ten years, and earlier and oftener if called for, in the paper writing dated April 18th 1867 (last codicil), contain infidel and atheistical sentiments, teachings and arguments, and that said works deny the truths of the Christian religion, and of revelation, and the existence of a God; and the plaintiff charges that the effect of carrying out and executing said trust would be the propagation of infidel and atheistical doctrines, and would be contrary to good morals and to law." The amendment containing the foregoing grave averments was filed in the court below after the case had been argued and the day before it was decided. The defendants contend that it was filed irregularly, and ought not to be considered here. Yet it comes up regularly, no motion has been made here or in the court below to purge the record, and for the purposes of this case we shall consider it as before us, without, however, deciding any question of its regularity. The only other matter relied on by the plaintiffs to sustain their position is the fifth section of the first codicil of the testator's will, which is as follows:

"I do not wish that any work should be excluded from the library on account of its difference from the ordinary or conventional opinions on the subjects of science, government, theology, morals or medicine, provided it contains neither ribaldry nor indecency."

Following immediately after, in the same section of the same codicil, the testator adds, evidently in explanation and vindication of the above, the following:—

"Temperate, sincere and intelligent inquiry and discussion are only to be dreaded by the advocates of error. The truth need not fear them, nor do I wish the Ridgway Branch of the Philadelphia Library to be encumbered with the ephemeral biographies, novels and works of fiction or amusement, newspapers or periodicals, which form so large a part of the current literature of the day. The great object of a public library is to bring within the reach of the reader and student works which private collections do not and cannot contain, and which in no other way could be accessible

·[Manners *v.* Library Company.]

to the public. Its excellence will depend, not upon the number of its volumes, but upon their intrinsic value; and I wish this principle to be carried out by the managers, who, I hope, will never be influenced by the too common ambition for mere numerical superiority."

The plaintiffs contend that the will and codicils of Dr. Rush contain a foundation for atheism and infidelity; that the law while tolerating the freest discussion, will never lend its hand for the protection and support of immorality; that in a land where religion and sound morals are recognised as the foundation-stones of government, no trust can exist for the protection of that which destroys the state.

No fault is found with this statement of the law. It may be regarded as settled in Pennsylvania, that a court of equity will not enforce a trust where its object is the propagation of atheism, infidelity, immorality or hostility to the existing form of government. A man may do many things while living which the law will not do for him after he is dead. He may deny the existence of a God, and employ his fortune in the dissemination of infidel views, but should he leave his fortune in trust for such purposes, the law will strike down the trust as *contra bonos mores*. We need not elaborate this question nor extend the illustrations. The whole subject is thoroughly discussed in a number of cases which fully sustain the principle above stated. See Updegraph *v.* The Commonwealth, 11 S. & R. 394; Vidal *v.* Girard's Executors, 2 Howard 127; Zeisweiss *v.* James, 13 P. F. Smith 465. In the case last cited, the testator devised all his property to his grand-nieces for their lives and the life of the survivors, remainder to "The Infidel Society in Philadelphia, hereafter to be incorporated for the purpose of building a hall for the free discussion of religion, politics," &c. This court said, referring to the trust for the infidel society: "It is plain that no court would ever undertake to administer such a charity."

This brings us to the examination of the grounds upon which it is alleged that the trusts of Dr. Rush's will are not fit to be enforced in a state where good order and sound morals prevail, and where Christianity is the popular and recognised religion.

Much stress is laid upon the expression by the testator in the first codicil, of the wish that no work should be excluded from the library on account of its difference from the ordinary or conventional opinions on the subject of science, government, theology, morals or medicine. This language is construed by the plaintiffs as a direction or command that every work *shall* be included, however much it may be at variance in its teachings or doctrines from the ordinary or conventional opinions on the subject referred to, provided it contains neither ribaldy nor indecency. That is to say, all works advocating atheism, infidelity and immorality gen-

erally shall be included; and that no discretion is left to the executor under the will to exclude such books. While the words " I wish" in a will are sometimes construed as a command and not as merely precatory, we do not so regard them here. The testator evidently intended to express a preference merely, and however binding the executor might regard it in *foro conscientiæ*, it would not be held to be binding upon him legally.

We must examine this clause of the will from the testator's standpoint, so far as that is possible, in order to ascertain his meaning in the paragraph in question. He was an educated man, of scholarly habits, and of no mean scientific attainments. The ample fortune which he enjoyed gave him the opportunities of indulging his tastes fully. He says in his will: " My property has enabled me to devote, happily and undisturbed, the latter part of my life to pursuits of scientific inquiry, which I have deemed to be more beneficial than the mere common enjoyment of an ample fortune." In his researches in the paths of science, even in the line of his own profession, it is not unlikely he fully realized that the conventional opinions of yesterday may not be those of to-day, and are not likely to be those of to-morrow. He possibly remembered that when he commenced the practice of medicine, a patient burning with fever was not allowed a breath of fresh air or a drink of cold water; that bleeding was resorted to in almost every disease; that the introduction of anæsthetics was by some regarded as impious and unscriptural, and an attempt on the part of females to defy the primeval course; that before his day, Harvey's theory of the circulation of the blood was treated with derision and cost that eminent physician a large portion of his practice, and that Jenner's discovery of vaccination was denounced by his own profession as empirical, and by the clergy as wicked. And outside of his own profession, in science, government, theology and morals, he would have seen substantially the same thing; one discovery treading quickly upon the heels of another; one conventional opinion after another giving way before the spread of learning and the advance of science. From his own experience in his various researches the testator probably realized the importance and value to educated men of a public library which should place within their reach such books as are not readily accessible. With a desire to promote temperate, sincere and intelligent inquiry and discussion, he imposes no restriction upon the character of the books except that they shall not contain either ribaldry or indecency. He would make his library a place where the student, whether of science, government or theology, could find the information for which he longed. His recommendation in regard to books was negative merely. Beyond his own writings, which will be noticed hereafter, he directed no book to be placed upon the shelves. This is as true in regard to theology as to any of the other subjects men-

[Manners *v.* Library Company.]

tioned. It can hardly be said that the interests of Christianity and sound morality require that the student of theology shall be debarred access to all books that may be regarded as objectionable from an orthodox standpoint. He is best armed to defend Christianity who is familiar with arguments against it. To enforce such a rule would exclude from this library a vast amount of the choice literature of the past; the works of authors who merely wrote according to the light of their day and generation. We may now safely enjoy all that is good of their writings. The world has outgrown their errors.

The amendment to the bill presents a different question. It is there distinctly charged that the works of Dr. Rush, which by his will he directs to be published every ten years, contain atheistical and infidel sentiments, and deny the truths of the Christian religion, of revelation, and the existence of a God. As this averment comes up upon the record, and stands unchallenged, we must assume it to be true. The works of Dr. Rush are not before us, and we state merely the legal effect of the pleadings. We have already seen that no trust can be sustained in Pennsylvania for the propagation of such sentiments. Hence, if the primary object of the trusts of the will is to disseminate infidel views, or to attack the popular religion of the country, it would be the duty of a court of equity to declare such trusts to be against public policy and therefore void. But the devise in his will is to a public library; to extend the usefulness of one already in existence if his devise is accepted, or to found a new one if his munificent gift is declined. This is an object which the law favors, and a trust which equity will administer. It was recently held by this court that the Philadelphia Library was a public charity, and its property, the very building in question, free from taxation for that reason: Donohugh *v.* Library Company, 5 Norris 306. The devise to the library being for a lawful purpose, and having vested, and the primary intent of the testator being to assist what this court has declared to be a "purely public charity," is the intent of the testator to be defeated, and the trust set aside because one of the directions or conditions of the bequest as to a secondary intent may happen to be illegal? The answer to this question is not difficult. It is at least doubtful since the passage of the Act of 26th of April 1855, Pamph. L. 331, whether the heir-at-law has any standing in court upon a bill to set aside the trusts of a will. Conceding, however, that said act does not apply to this case, the authorities are clear that the law will strike down the unlawful direction and leave the primary intent untouched. To this extent the doctrine of *cy pres* is part of the law of Pennsylvania. We need not load this opinion with an extended citation of authorities. The subject is fully discussed and the authorities collected in the recent case of City of Philadelphia *v.* Girard's Heirs, 9 Wright 9. The principle is there

stated that "it is a rule of law and equity that where a vested estate is distinctly given, and there are annexed to it conditions, limitations, powers, trusts (including trusts for accumulation) or other restraints relative to its use, management or disposal, that are not allowed by law. It is these restraints, and the estates limited on them that are void, and not the principal or vested estate." The clause in Dr. Rush's will regarding the character of the works to be placed in the library, and the provision in the codicil for the publication of his own works are not conditions precedent to the vesting of the estate. If they are unlawful they will be disregarded. If the fact be that the testator's works are of the character alleged in the bill it is not likely the defendants will ever publish them. No court would compel them to do so.

The averment in the sixth paragraph in the bill, that the library company have not finally accepted the devises contained in the will and codicils, and have declined to accept the same upon the trusts and conditions therein contained, does not help the plaintiffs. The bill does not allege, that the time has yet arrived for the defendant company, to elect or refuse the trusts referred to; while it is expressly provided in the will, that in case of such refusal, the estate shall be held by the executor in trust "to found and endow a public library, entirely distinct from and independent of the Philadelphia Library, to be named and called the Ridgway Library, under the rules, regulations, conditions and stipulations in my said last will, and the codicils thereto expressed and contained."

The twelfth paragraph of the bill avers, "That within one calendar month prior to his decease, the said Dr. James Rush, purchased a lot of ground, situate on the southeast corner of Broad and Christian streets, in the city of Philadelphia, which said lot was purchased by him, and was subsequently conveyed for a charitable use, as set forth in the trusts and conditions contained in the aforesaid writings, alleged to be his last will and codicils."

It was further averred, that said transaction is void, by reason of the purchase for the use of said charity having been made within one calendar month of the decease of the said testator, contrary to the provisions of the Act of Assembly of the Commonwealth of Pennsylvania, entitled, "An act relating to corporations and estates, held for corporate, religious and charitable uses," approved 26th April 1855. It was urged, that as the facts are admitted by the demurrer, upon this point at least, the plaintiffs are entitled to a decision in their favor. It is true that a demurrer admits all the facts well and sufficiently pleaded. It requires but a glance at this section of the bill, however, to see that it is evasive and uncertain. There is no statement how the lot was so purchased and conveyed; nor whether it was conveyed by the testator or to the testator; nor when, by whom, or in what manner it was conveyed

[Manners *v.* Library Company.]

for a charitable use. The Act of Assembly is in derogation of the common-law right of conveyance, and the averments of the bill must be so distinct and clear, as to bring the case within the terms of the law. Instead of these defects being cured by the demurrer, the law has always been, that upon special demurrer, such defects are fatal. One of the principal rules laid down by Stephen in his Treatise on Pleading, at page 378, is the following: "Pleadings must not be ambiguous or doubtful in meaning; and when two different meanings present themselves, that construction shall be adopted which is most unfavorable to the party pleading." To the same point is the third of Bacon's maxims: "You shall find, that in all imperfections of pleadings, whether it be in ambiguity of words and double intendments, or want of certainty and averments, or impropriety of words, or repugnance and absurdity of words: ever the plea shall be strictly and strongly taken against him that pleads." And Evans in his work on Pleading, referring to the above rule laid down by Stephen, says at page 188: "This rule, which is applied by our law to all writings whatever, has its origin in the just and obvious policy of discouraging a crafty ambiguity. Its application is more rigorous in some cases than in others. Rigor is more or less proper as the probability of a designed ambiguity is greater, and that of ignorance less. In pleadings which are, or ought to be drawn with great care, by men thoroughly acquainted with the effect of language, a case proper for the utmost rigor is presented." A host of authorities are cited by Stephen in support of his text. We need not refer to them, as the rule is well settled.

Aside from the defective averments in the bill, it is manifest, from an examination of Dr. Rush's will, that the provision for the endowment of this library was written years before his death, and that the purchase of the lot in question was but an investment, or a change of investment, and has no more significance for the purposes of this case than if he had invested a corresponding amount in city loan or other securities. It has never been held that where a testator devised the bulk of his fortune to a charity that a change of investment made within one calendar month prior to his death, avoided the prior devise or trusts of his will. Such a rule would seriously embarrass the management of his property by a testator and serve no useful purpose. In Schultz's Appeal, 30 P. F. Smith 396, the testator devised his estate unconditionally to an individual with the intent to evade the statute, and it was held that the devisee not being a party to the fraud, the estate vested in him, and the case was not within the statute, though he designed to carry out the testator's verbal directions, "the bequest was not within the words of the statute."

We need not pursue the subject further, nor discuss the minor questions involved. With the failure to establish the main proposi-

[Manners *v.* Library Company.]

tion, that the trust fails by reason of the objectionable character of Dr. Rush's works, the superstructure of this bill crumbles.

The decree is affirmed and the appeal dismissed at the costs of the appellants.