Girard Clarification Petition.

298

Submitted September 21, 1966. Before BELL, C. J., MUSMANNO, JONES, EAGEN, O'BRIEN and ROBERTS, JJ.

*Arthur Littleton, John Russell, Jr., Ernest R. Von Starck, Richard P. Brown, Jr., Gaffney & Gaffney,* and *Morgan, Lewis & Bockius,* for petitioners.

*Edward Friedman,* Attorney General, for Commonwealth, respondent.

*Edward G. Bauer, Jr.,* City Solicitor, and *Levy Anderson,* First Deputy City Solicitor, for City of Philadelphia, respondent.

*William T. Coleman, Jr., Charles J. Biddle,* and *Dilworth, Paxson, Kalish, Kohn & Dilks,* and *Drinker, Biddle & Reath,* for individual appellants and respondents.

OPINION BY MR. JUSTICE ROBERTS, December 6, 1966:

The sole issue before this Court is whether we should entertain a petition for clarification of two opinions rendered by this Court in the *Girard College Trusteeship,* 391 Pa. 434, 138 A. 2d 844 (1958), and *Girard Will Case,* 386 Pa. 548, 127 A. 2d 287 (1956), eight and ten years ago respectively. Only two members of the present Court participated in the first *Girard* decision, and three, in the second.

Significantly the district court refused to abstain from deciding the state issues involved in this controversy. *Commonwealth v. Brown et al., Trustees of the Estate of Stephen Girard,* 260 F. Supp. 323 (E.D. Pa. 1966). Due regard for the proper administration of our federal-state system of dual judicial tribunals suggests that it would be highly inappropriate for this Court to entertain the petition for clarification, since the district court's decision is currently on appeal before the United States Court of Appeals for the Third Circuit.

It should be emphasized, however, that the determination by this Court not to entertain the petition in no way implies a view on the merits of any issue in the controversy presently before the federal courts.

The petition for clarification is therefore denied.

———

CONCURRING OPINION BY MR. JUSTICE JONES:

I join in that which has been stated by the majority of my colleagues in the denial of this petition.

I would add that, in my opinion, the procedure adopted by the petitioners to obtain clarification not of

*orders* but of *opinions* of this Court, rendered ten and eight years ago, respectively, is highly inappropriate.

Mr. Justice EAGEN and Mr. Justice O'BRIEN join in this concurring opinion.

-----

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I very strongly disagree with the majority, the concurring and the dissenting Opinions. With respect to the concurring Opinion, the law is contrary thereto: *Lawler v. Commonwealth,* 347 Pa. 568, 33 A. 2d 432; *Crawford's Estate,* 313 Pa. 127, 169 A. 438. The dissenting Opinion by Mr. Justice MUSMANNO merely restates the views and contentions which, as the sole dissenting Judge in the two prior decisions of this Court, he had previously expressed in those decisions. The majority Opinion states that it would be highly inappropriate for this Court to entertain a petition for clarification whenever a District Court's decision, which negatives or, in effect, overrules a decision of the Supreme Court of Pennsylvania is currently on appeal before a United States Court of Appeals. Nothing so greatly diminishes or destroys the respect of all the people of the United States for our Courts and for Law alike as when a Federal District Court Judge unwisely exercises jurisdiction of a matter which has frequently and more properly been before a State Court, and thereafter ignores or nullifies decisions of the Supreme Court of this or any other State.

We turn now to a consideration of *Girard Will Case,* 386 Pa. 548, 127 A. 2d 287, and *Girard College Trusteeship,* 391 Pa. 434, 138 A. 2d 844.

This Court, twice within the last few years, has interpreted Girard's will, and has held that Negro boys did not come within the will's provisions and could not be admitted to Girard College: *Girard Will Case,* 386

Pa., supra,* and *Girard College Trusteeship,* 391 Pa., supra. Certiorari in this last case was denied by the Supreme Court of the United States in 357 U.S. 570. In each of these cases, the Supreme Court of Pennsylvania heard and considered and decided all of the contentions which the Commonwealth of Pennsylvania and the City of Philadelphia and counsel for Negro boys are now making to the District Court of the United, States.

In *Girard College Trusteeship,* this Court considered inter alia and rejected the contention that the Public Accommodations Act of June 24, 1939, P. L. 872, §654, 18 P.S. §4654, applied to Girard College, which this Court has said twice is primarily and principally an *Orphanage Establishment* for poor male white orphans.** Since the application of the Public Accommodations Act, which was cited by counsel for the Negro boys in a footnote in their brief and was not specifically referred to in the body of this Court's Opinion in *Girard College Trusteeship,* I believe that clarification of our Opinion (after oral argument on this point) is, under all the circumstances, wise.

Each and all the parties in interest had two appropriate remedies: (1) clarification. See *Lawler v. Commonwealth,* 347 Pa., supra; *Crawford's Estate,* 313 Pa., supra; and (2) a petition to the Orphans' Court of Philadelphia County for a reconsideration of Girard's will in the light of (a) changed circumstances, and (b) recent decisions of the Supreme Court of Pennsylvania and of the Supreme Court of the United States.

It is well established that the meaning and interpretation of a *State statute* is a matter for the State Courts and not for a Federal Court. *Erie Railroad*

---

* This Opinion by Chief Justice STERN spoke for five members of this Court, with only Justice MUSMANNO dissenting.

** The admission age for these orphan boys is between 6 and 10 years.

*Company v. Tompkins,* 304 U.S. 64; *Mine Workers v. Gibbs,* 383 U.S. 715, 726.

Every Judge knows, and nearly every attorney knows, that a Court frequently does not specifically discuss and answer in its Opinion in every case, every contention made by either or both of the parties. Since the Public Accommodations Act of 1939 was not specifically discussed *and specifically rejected* (as inapplicable to Girard College) in this Court's Opinion in the *Girard College Trusteeship* case, and since Federal District Court Judge JOSEPH S. LORD, III, in *Commonwealth v. Brown, Trustees of the Estate of Stephen Girard,* Civil Action No. 39404, 260 F. Supp. 323, based his Opinion on his interpretation of the Public Accommodations Act,* I favor (I repeat) oral reargument in order to clarify our decision on this point.

It is important to note what Judge JOSEPH S. LORD overlooked was that the Supreme Court of Pennsylvania, in *Girard College Trusteeship,* 391 Pa., supra, pertinently said (page 445) : "The private character of the trust and the privacy of the Orphanage which the trust was established to maintain and administer were aptly described in Girard Will Case, supra, as follows: 'All provisions of the will show that it was not intended to be a public school; indeed, it is not merely a school at all but what Girard himself called in a codicil to his will, an "Orphan Establishment," a home where the fatherless boys eat, sleep, study and live together, enjoying the testator's bounty which provides for them not only an education but also lodging, board, clothing and all the necessities of life. . . . [Girard College] is erected on land owned by Girard and the buildings

---

* Section 654(d) of The Penal Code of June 24, 1939, P. L. 872, 18 P.S. §4654, provides: "(d) Nothing contained in this section shall be construed to include any institution, club or place or places of public accommodation, resort or amusement, which is or are in its or their nature distinctly private, . . ."

were constructed with his own funds. . . . The college has been supported and maintained for now over a century by Girard's estate; not a penny of State or city money has ever gone into it; no taxpayer has ever been called upon to contribute to it; . . .' "

The second alternative appropriate action in which the question of the admission of Negro boys and the applicability of the Public Accommodations Act and other related questions concerning Girard's will could have been raised, was in the Orphans' Court of Philadelphia, which is and for nearly one hundred years has been an outstandingly able Court in this field of law—certainly far more experienced than a lower Federal Court District Judge. The rights of everyone, including the rights of Negro boys to be admitted to Girard, would be thus completely protected by experts. The losing party in such a case would have an absolute and unqualified right of appeal to the Supreme Court of Pennsylvania with its experience and expertise in this field of law, and if the losing party therein desires, he, it or they can appeal for a certiorari to the Supreme Court of the United States.

This is a brief statement of the reasons for my very strong dissent to the failure of this Court to clarify *beyond any possible doubt* the prior decisions of this Court on the subject, and its interpretation of the Public Accommodations Act.

————

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The trustees of Stephen Girard have petitioned this Court for clarification of decisions rendered by this Court in the *Girard Will Case,* 386 Pa. 548, and the *Girard Will Trusteeship Case,* 391 Pa. 434, on the ground that this Court, in resolving the issues in those

cases, made no reference to the Pennsylvania Public Accommodations Act.[1]

The position of the petitioners is well taken. In the long and exhaustively discussing opinions filed in those two cases, not one mention is made of the Public Accommodations Act. Indeed, the petitioners themselves (City of Philadelphia, Commonwealth of Pennsylvania and two applicants for admission to Girard College) made only the slightest reference to the Act in their briefs and did not argue it orally at all. Counsel representing the petitioners could well have believed that the artillery of the Fourteenth Amendment was in itself formidable enough to strike down the wall of racial exclusion practiced at Girard College and that, therefore, the subsidiary support of a statute would be an obtrusive superfluity.

It now develops, however, that it was a mistake not to have urged on this Court the applicability of the Public Accommodations Act to the facts in the *Girard Will Case* and it was a grave oversight of this Court not to have sua sponte ruled the Public Accommodations Act controlling.[2] Precision in the law, a regard for justice and a due appreciation of public events of which this Court cannot help but take judicial notice, dictate that we reconsider what has been said heretofore in this legal controversy. I believe that we have a duty to clarify the law, all to the end that turmoil, based on confusion, may disappear from the streets, that the order and dignity of the Commonwealth may be upheld with decorum, and that constitutional pre-

---

[1] Act of May 19, 1887, P. L. 130, as amended by the Act of June 11, 1935, P. L. 297, and as reenacted in The Penal Code, Act of June 24, 1939, P. L. 872, §654.

[2] I did not discuss the Public Accommodations Act in my two dissents because the object of a dissent is to refute what appears in the Majority Opinion.

rogatives be declared sacrosanct and enforced, unaffected by pedantic and offensive irrelevancies.

For instance, the Majority Opinion in the *Girard Will Case* stated a number of times that "a man's prejudices are a part of his liberty." This statement is not only revolting but illogical. If spoken by one unlearned, it would be absurd and unworthy of notice, but coming from a distinguished tribunal it can only make the unlearned assume that they are indeed wise. Philosophically speaking, one may have the right to ride over a cliff on the horse of his prejudices, but he has no right, through the exercise of those prejudices and racial bias, to infringe on the liberty of others. And he certainly is not authorized, while wallowing in his prejudices, to perform a deed which is prohibited by the Constitution of the United States dedicated to the liberty of all.

The Public Accommodations Act specifically declares that it is unlawful for any of the establishments therein enumerated to deny the privilege of that establishment to any person "on account of race, creed or color." In the enumeration, there appears the item: "all educational institutions under the supervision of this Commonwealth." The proof that Girard College is under the supervision of the Commonwealth is as conclusive as document, testimony, court records, legislative enactments, government reports and physical inspection can rivet down an irrefutable fact.

The Girard College could never have come into being without the initiative of the Pennsylvania Legislature which was required, under the Girard will, to do certain things or the trust providing for the Girard College would fail. On March 24, 1832, the General Assembly passed an act directing the constituted authorities of the City of Philadelphia to carry into effect the will of Stephen Girard. A month later the State Legislature enacted a law empowering the City

Council of Philadelphia to appoint officers and agents to execute the duties and trusts created by the Girard will. Another statute was passed on February 24, 1847 making the City of Philadelphia the guardian of every Girard College orphan and prohibiting interference from any orphan's relative. Still another Act authorized the City of Philadelphia to bind Girard College orphans as apprentices. The Legislature appointed a Select Committee of the House of Representatives on the Estate of Stephen Girard. The Philadelphia City Council passed an ordinance providing for the construction of the college and later ordained that contracts entered into by the College had to be validated by the Council. Between September 15, 1832, and December 18, 1869, the City of Philadelphia enacted 48 different ordinances devoted exclusively to the Girard College. In 1869 the management and direction of Girard College was placed in the hands of a Board of Directors of City Trustees, created by the General Assembly (Act of June 30, 1869, P. L. 1276), the board to be made up of the Mayor, the Presidents of the Select and Common Councils, and 12 other citizens to be appointed by the Court of Common Pleas of Philadelphia. The treasurer of the City of Philadelphia was to serve as the treasurer of the board. The board was required to report annually to the City Council, to the State Legislature and to the Court of Common Pleas. The City Controller was to audit the accounts. The Act made the members of the board city officers. With this kind of governmental direction, responsibility, control and supervision, I confess I cannot understand how any one can regard Girard College as other than a public institution.

Indeed, the Supreme Court of the United States, in upholding the thesis of my dissent in the *Girard Will Case,* declared: "The Board which operates Girard College is an *agency of the State of Pennsylvania.* There-

fore, even though the Board was acting as a Trustee, its refusal to admit Foust and Felder to the college because they were Negroes was discrimination by the State. Such discrimination is forbidden by the Fourteenth Amendment. Brown v. Board of Education, 347 U.S. 483." (*Pennsylvania v. Board of Trusts*, 353 U.S. 230). (Emphasis supplied).

The case was remanded to this Court which, in turn, remanded it to the Orphans' Court of Philadelphia County. That court then, in an action reminiscent of Star Chamber proceedings of judicially tyrannical days, substituted for the Board of Directors of City Trusts thirteen other persons as trustees of the Girard Estate. The orphans' court brought this about without a hearing of any kind and without allowing counsel for the Negro applicants or the City of Philadelphia or the Commonwealth of Pennsylvania to be heard. It did this in violation of the Act of June 30, 1869, supra; it accomplished this in a flagrant abuse of discretion; it performed this deed with a denial of due process. However, despite this high-handed maneuver, the decision of the orphans' court could not affect realities. The orphans' court could not change the public nature of Girard College any more than a leopard can change its spots. Changing the crew on a battleship cannot transform the battle wagon into a fishing schooner.

The yolk of the egg of this situation which, however it may be scrambled, can never change its essence, is that no matter how appointed, a trustee may not practice in the Girard College, a discrimination which is denounced by the Fourteenth Amendment to the Constitution of the United States. The Girard College, because of the nature of its origin, its legislative history, its councilmanic management, its municipal control and subservience to governmental supervision is as much a public institution as the University of Pennsylvania and is, therefore, bound by the decision of

the Supreme Court of the United States in *Brown v. Board of Education*, 347 U.S. 483.

It is true that the action of the orphans' court was reviewed by this Court which arrived at another wrong decision, and that an application was then made to the Supreme Court of the United States for a writ of certiorari which was denied. That denial, however, did not necessarily mean that it approved of what had been done by the orphans' court. Refusal to hear a case on certiorari may be predicated on a number of factors, none of which may equate with affirmation of the action taken by the lower court. After all, the Supreme Court of the United States is so overburdened with petitions for certiorari that its issuance of writs must necessarily be highly selective. Having once spoken decisively on a subject and having laid down guidelines, as it did in *Pennsylvania v. Board of Trusts*, supra, it was not necessary to repeat what it had said. No opinion was filed by the Court in refusing certiorari on the second appeal.

Despite the complicated theories, advanced by the trustees of Girard College, despite the long, tenuous arguments that have been spun from a seemingly unemptiable spool, and despite the rivers of printers' ink that have been poured into the moat to keep Negro boys out of the citadel of equality, the issue in this case is so simple that one can only be appalled that the moat has not dried up and the drawbridge lowered to allow Negro boys into their constitutional rights. This is the year 1966 and the law is as clear as the figures on a large calendar that the provision in the Girard will excluding Negro boys from the College on a racial basis is today illegal. No matter whether the exclusion was correct or not in 1831, the exclusion clause is unsustainable in 1966. If the owner of the property who transfers it in trust provides that "the trustee shall do an act which at the time of the crea-

tion of the trust is legal, but which owing to a change of law or owing to a change of circumstances becomes illegal, the provision becomes unenforceable." (Restatement 2d, Trusts, §61, comment b (1959). If a testator today should leave his property in trust to a school for the training of destructive atom bomb engineers, and then later the destructive atom bomb should be wholly outlawed, certainly it would be illegal for the school to go on instructing students on how to fragmentize Mother Earth.

If the guns of the Civil War blasted away the chains holding Negroes in slavery, which it did, it would be strange indeed to say that the heat of that conflict did not melt away the exclusionary clause of a will based on the institution of slavery. There is nothing in the life of Stephen Girard which would suggest that he was motivated by racial prejudice. In limiting admission to his school to white children, he was merely noting that the social conditions of Negroes in 1831 was such that possibly very few Negro children would qualify to embark on the educational course planned for his college. It could be also that the matter of the school's capacity determined the method of selectivity. There already existed such an excessive number of white poor orphans, all of whom could not be accommodated under the roof of the Girard College, that Girard may have felt he had to draw a numerical line somewhere. But that limitation no longer exists.

According to the complaint filed in *Commonwealth v. Brown,* 260 F. Supp. 323, by the Commonwealth of Pennsylvania, the Attorney General of the Commonwealth and City of Philadelphia in behalf of seven minor Negro male orphans seeking admission to Girard College, the College is large enough to accommodate 2,-000 boys, but it presently serves only 700 because there cannot be found enough white poor orphans who need this free board and education. Indeed, it is averred

that the trustees, being unable to locate an adequate number of poor white children to populate its grounds and buildings, are now taking children from "families of considerable means." They are also going out of Philadelphia to recruit white orphans to fill the unfilled echoing halls of the school.

Since Girard College is a charitable institution, it is difficult to see what principle of charity urges the trustees to desperately dredge the hinterlands of Philadelphia for students, when there are knocking at the gates of the College countless Negro poor boys eager to quench their thirst for knowledge at the fountains of learning spilling into the void because there are not enough boys in the college to drink from the abundance. Why must 1300 desks go unattended and 1300 places at tables remain empty when there are thousands of Negro lads hungry for food for the stomach as well as for the mind?

To deny admission to Girard College because of race, and race alone, is not only a defiance of the Public Accommodations Act, but it is also a violation of the Human Relations Act;[3] it is an infringement on the guarantees of the 14th Amendment; it is an insult to the signers of the Declaration of Independence who pledged their lives, their fortunes and their sacred honor to the proposition that "All men are created equal." That the trustees should do this almost within sight of the Independence Hall where that immortal document became the charter of our liberties is a paradox that is as incomprehensible as it is melancholy.

Excluding Negroes from Girard College is segregation and nothing else. And segregation is just as wrong in the North as it is in the South, and it should be just as unenforceable in Pennsylvania as in Alabama.

---

[3] 43 P.S. §951 et seg.

The provisions in Girard's will excluding Negro boys from Girard College contravenes the public policy of Pennsylvania and for that reason alone is to be negated. That is the law of Pennsylvania declared repeatedly by this Court. I cite only a few applicable cases: *Greenfield's Estate*, 14 Pa. 489; *Manners v. Philadelphia Library Co.*, 93 Pa. 165; *Devlin's Trust Estate*, 284 Pa. 11; *Wanamaker's Estate*, 335 Pa. 241; *Scholler Estate*, 403 Pa. 97.

I believe it is almost an affront to Negroes to speak of their American rights. It would be like saying that Alaskans are entitled to all the privileges and prerogatives enunciated in the Constitution of the United States. Why should one have to emphasize the obvious, expatiate on the universal, and dwell on the self-evident? Nevertheless, the action and attitude of the trustees of Girard College make it necessary to remind them that the 13th Amendment freed the Negro, the 14th Amendment made him a citizen, the 15th Amendment assured him the vote. As the result of this unlimited emancipation, Negroes participate to the utmost in every possible phase of American occupational, artistic, directional, sports and official life. In government they serve in the State and Federal legislatures, they occupy important executive posts, they adorn the judicial bench in many parts of the Nation, and only recently a highly qualified and honored member of the Negro race was elected to the greatest deliberative body in the world, the United States Senate. Negroes not only enjoy these prerogatives, but they also accept their responsibilities, many solemn and hazardous. They have fought on America's battlefields in every war, they are today holding the jungle lines with their white brothers in Viet-Nam. It can only give one pause, then, that although Negroes are thus accepted as full citizens in every activity in the American way of life, their young kin should be refused admittance

into a school in Philadelphia, the Cradle of American Liberty.

It is argued that to allow Negro boys into Girard College would be to change the Girard will and this, like the laws of the Medes and Persians, can never be altered. This technical argument is a stultification that would make swallowing a camel while straining at a gnat a demonstration of supreme intelligence as well as extraordinary digestive capacity. The simple fact of the matter is that the courts, by interpretation, have changed the Girard will a number of times. To begin with, the Courts have modified the meaning of the word *orphan,* the ultimate passport without which no child may enter Girard College. An orphan, according to Webster's International Dictionary, is "a child bereaved by death of both father and mother, or, less commonly, of either parent;—in the latter case sometimes called half-orphan." But the Girard will did not speak of half-orphans. Nevertheless, this Court in *Soohan v. City of Philadelphia,* 33 Pa. 9, decided that "orphan" included "half-orphans" because it was interpreting the spirit of the Girard will which was directed toward taking care of children who were poor and in need of attention and care.

Article XX of Girard's will specifically states that: "So far as regards my real estate in Pennsylvania in trust, no part thereof shall ever be sold or alienated." Despite this specific prohibition, real estate of the Girard Estate has been sold. This Court, in approving sales of Girard real estate said that they were made "because the income of the trust had shrunk to a point where the college could not be efficiently maintained and therefore the sales were the only recourse open in order to preserve the purposes of the trust." This explanation is pragmatic and what it approved was unquestionably beneficial to the Girard Estate, but it cannot be denied that this Court approved of an

interpretation which made the will do what it specifically stated should not be done.

Girard also declared that the terms of leases of his real estate were not to exceed 5 years. Nonetheless, under Court approval, the administrators of the Girard Estate executed leases for 15 years. In view of these alterations in the will, let us not any more hear the sophistry that Girard's language is the law of the Medes and the Persians.

In my view of the case Girard College was never a private school, but if it was so in genesis, it is now by intervention of public authorities, a public institution. Stephen Girard planted an acorn which is now the towering oak of Girard College, but that acorn would have been devoured by worms and the name of Girard College would have died in the verbiage of the Girard will had it not been for the Pennsylvania Legislature which enacted four laws to prepare the terrain for the sprouting of the acorn. That acorn would never have thrust its first tiny stalk through the crust of the earth to become a sapling aiming for the sky, had it not been nurtured, watered and cared for by the Pennsylvania Legislature, the Executive Department of the Commonwealth, and the City Government of Philadelphia. David Berger, the then City Solicitor of Philadelphia well said in his able brief in *Girard College Trusteeship*, 391 Pa. 434, 464, "The private property owned by Girard at the time of his death no longer exists, except in a highly mystical sense."

Girard College is a public institution in every sense of the word and its trustees are bound to enforce the provisions of the Public Accommodations Act. I should think that the trustees would graciously accept the inevitable and do their duty. They will have to do it sooner or later because one would have to be myopic indeed to see the United States, and particularly the

State of Pennsylvania, reversing its steps on the broad highway to freedom for all races in our land. The exclusion of Negro children from Girard College on the basis of race alone transgresses not only against the Constitution and the laws of our people but it also offends against the inherent sense of American fairness. A child is born white, black, brown or red through no will of his own. He is a creature of God Who makes no distinction between peoples. They are all His children.

There is no way of saying with positiveness what Stephen Girard would say if he were to come back to earth today. However, considering his dedication to the well-being of the people, it can reasonably be assumed that he would not align himself against the will of the people as expressed by the Constitution and the laws passed in their name. I believe he would open the gates of Girard College to the little one who needs a bed and bread for his body and education for his mind. Girard would do this regardless of the color of the hands uplifted to him for help and guidance.

Because of the segregation policy being pursued by the trustees of Girard College, the good name of Philadelphia, as the birthplace of American liberty, is being besmirched throughout the country. Stephen Girard in his grave must be offended by this uncharitable program in an institution he founded on the principle of charity. The law of Pennsylvania does not approve of the trustees' exclusionary program and the Constitution of the United States, which had its birth in Philadelphia, is repelled by that program. The trustees should, with the utmost celerity, scour from history's page this stain on the fair name of the City of Brotherly Love and the divine cause of charity itself.

The trustees have a bounden duty to catch up with destiny. I am confident that the Courts will support them if they at last unlock the doors of Girard College to all the poor orphans who fall within the age requirements, regardless of the color of their fathers who are no longer here to support, guide, and comfort them.