**[J-55-2023]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| IN RE: TRUST B UNDER AGREEMENT OF RICHARD H. WELLS DATED SEPTEMBER 28, 1956 | : | No. 5 WAP 2023 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Superior Court entered September |
| | : | 7, 2022, at No. 1269 WDA 2021, |
| APPEAL OF: V.M.I. FOUNDATION, INC. | : | Affirming the Order of the Court of |
| | : | Common Pleas of Venango County |
| | : | entered October 5, 2021, at No. |
| | : | 2005-00235. |
| | : | |
| | : | ARGUED: October 17, 2023 |

**OPINION**

**JUSTICE WECHT**                    **DECIDED: MARCH 21, 2024**

In 1965, Richard H. Wells created a perpetual charitable trust (the "Trust") for the sole benefit of his alma mater—the Virginia Military Institute ("VMI"). VMI is a public university located in Lexington, Virginia. Wells named as the Trust's beneficiary the Virginia Military Institute Foundation (the "Foundation"), an entity that holds and oversees VMI's endowment assets. Since its inception, the Trust has been managed by an independent corporate trustee. Believing that it can manage the Trust with fewer expenses and higher returns, the Foundation now seeks to terminate the Wells Trust and to receive the assets outright, to be added to its endowment and administered consistently with Wells' charitable intentions.[1] The orphans' court evaluated the burdens borne by the Trust and the charitable benefits thereto, and it concluded that the burdens

---

[1] *See* 20 Pa.C.S. § 7740.3(e) (providing for the judicial termination of charitable trusts in defined circumstances).

did not meet the statutory criteria for termination. The Superior Court agreed, and accordingly affirmed the orphans' court's order.[2]

We conclude that, in denying trust termination, the orphans' court acted within the discretion afforded to it by Section 7740.3(e) of the Uniform Trust Act ("UTA"). The intent of the settlor to effectuate charitable giving through a perpetual charitable trust, as opposed to an outright gift, is protected by the high standard for termination that Section 7740.3(e) prescribes. The Foundation failed to satisfy this standard. We therefore affirm the Superior Court's order.

## I. Background

Wells, who was a member of VMI's graduating class of 1924, lived most of his life in Oil City, Venango County. In 1952, Wells became the president of the Oil City Trust Company, as well as a member of its board of directors. As president, Wells aggressively led the Oil City Trust Company to expand and to acquire additional banks. In 1954, Oil City Trust Company purchased two local banks and was renamed First Seneca Bank and Trust Company ("First Seneca"). Under Wells' leadership, the company continued to expand, quintupling in size. Wells was reelected as president continually until he retired in 1963.

On September 28, 1956, Wells created the Richard H. Wells Revocable Trust Agreement, establishing First Seneca as the corporate trustee. The trust originally provided for Wells' wife and children until their deaths, at which time the trust would be distributed to their heirs. If there were no heirs, then the trust assets were to be distributed to various individuals. The residue, if any, would go to VMI, to be added to its general endowment fund and identified as a memorial to Wells and the Class of 1924.

---

[2] *In re: Trust B Under Agreement of Wells*, 282 A.3d 1149 (Pa. Super. 2022).

Wells amended the trust four times. In 1960, Wells revoked the outright distribution to VMI. Instead, Wells directed that any remaining principal would be placed in a separate perpetual charitable trust, with a committee of the trustee bank's officers authorized to select the charitable beneficiaries. In exercising this discretion, the trustee was directed to afford favorable consideration to VMI in the allocation of trust income. Wells revised the trust again in 1961 and 1963, continuing to afford VMI favorable consideration for the distribution of the trust income of a contingent charitable remainder.

In 1965, Wells made his last amendment to the Trust. In this amendment, Wells instructed that, upon his wife's death, two named individuals would retain lump sums, and the remaining principal would then form the corpus of a perpetual charitable trust, with the Foundation as the sole beneficiary. Upon the death of Mrs. Wells, the Foundation was to receive income at least annually, to be credited to the Class of 1924, as follows:

> the Trustee shall add any accumulated and undistributed income in the trust to the principal thereof, and shall hold the thus augmented principal in trust, in perpetuity, and the Trustee shall pay and distribute the net income of the Trust, in perpetuity, at least annually, to the VMI Foundation, Virginia Military Institute, of Lexington, Virginia, which distributions shall by said VMI Foundation, Virginia Military Institute be credited to the Class of 1924, and which distributions shall be unrestricted, to be applied for such purposes as the governing board of the VMI Foundation may from time to time determine.[3]

Through each amendment, First Seneca remained the trustee. The final version of the Trust provided compensation for the trustee as follows:

> After the death of the Settlor the Trustee shall receive as compensation for its services such reasonable sum or sums of money as may be commensurate with the duties performed by it under this agreement, which compensation may include a commission computed on income and on

---

[3] Amendment to Revocable Trust Agreement, 7/7/1965, at 4, Article I.B.5; R.R. at 36a.

corpus, and which shall be in accordance with a schedule of compensation currently in effect when the services are performed.[4]

Wells died on March 30, 1968, and his Trust became irrevocable. Mrs. Wells died in 2004. In 1991, First Seneca merged into another bank and, through a name change and subsequent merger, was succeeded by PNC Bank in 2009.

In 1969, Congress passed the Tax Reform Act, which required the classification of certain trusts as private foundations and subjected all private foundations to the Private Foundation Rules ("PFR") prescribed by the Internal Revenue Code.[5] These rules require annual distributions of five percent of the fair market value of the trust's assets, subject to increasing penalties,[6] and compel an annual excise tax of 1.39 percent.[7] The Wells Trust is a private foundation subject to the PFR.

The principal of the Wells Trust has grown from $1.5 million in 2010 to over $2.1 million in 2020, with distributions to the Foundation totaling $639,314 in this same period. According to the Foundation, the Wells Trust generates annual distributions to the Foundation of approximately $67,000 per year.[8] PNC collects about $18,500 in annual fees for its duties as trustee. The Wells Trust also incurs expenses of about $750 each year for the preparation of tax returns.

On May 6, 2019, the Foundation filed a petition to terminate the Wells Trust, seeking to obtain the Trust's assets itself and to maintain the assets as a permanent fund

---

[4]    *Id.* at 6, Article I.C.3; R.R. at 38a.

[5]    26 U.S.C. §§ 4940-48.

[6]    *Id.* § 4942.

[7]    *Id.* § 4940(a).

[8]    In 2017, the Foundation received $71,961. Foundation's Br. in Support of Motion for Summary Judgment, Ex. 7, R.R. at 141a. In 2018, the Foundation received $59,757. *Id.*, Ex. 6, R.R. at 139a. And, in 2019, the Foundation received $83,021. *Id.*, Ex. 5, R.R. at 137a.

under terms and conditions similar to those set forth in the Wells Trust, in honor of Wells and the Class of 1924. Judicial termination of a charitable trusts is authorized by Section 7740.3(e) as follows:

> *If the separate existence of a trust,* whenever created, solely for charitable purposes *results or will result in administrative expense or other burdens unreasonably out of proportion to the charitable benefits, the court may,* upon application of the trustee or any interested person and after notice to the Attorney General, *terminate the trust,* either at its inception or at any time thereafter, *and award the assets outright*, *free of the trust, to the charitable organizations*, if any, designated in the trust instrument or, if none, to charitable organizations selected by the court, in either case for the purposes and on the terms that the court may direct *to fulfill as nearly as possible the settlor's intentions other than any intent to continue the trust*, if the court is satisfied that the charitable organizations will properly use or administer the assets.[9]

The Foundation described the growth of its endowment over time. Although the endowment was small at the time of Wells' death, it has since grown to exceed $500 million and is now one of the largest endowments per student of any public university in the United States. Within the endowment are fifteen hundred restricted funds that the Foundation maintains in separate accounts. All of these assets are managed by BNY Mellon. The Foundation asserted that PNC's fees, at twenty-eight percent of the income, coupled with other administrative expenses and burdens, were unreasonably out of proportion to the charitable benefits of the Trust. The Foundation asserted that, if it were able to add the assets from the Wells Trust to its own endowment, it would save approximately $13,450 each year, which is about one half of one year's tuition for an in-state cadet at VMI.

---

[9]     20 Pa.C.S. § 7740.3(e) (emphasis added).

PNC filed an answer. Shortly thereafter, the Commonwealth entered its appearance as *parens patriae*.[10] Relying upon evidence that Wells had amended his Trust four times and that each amendment designated the Foundation as a beneficiary and provided for a third-party financial institution to serve as corporate trustee, PNC argued that termination would be contrary to Wells' intent as expressed in the explicit terms of the trust document. PNC further argued that the Foundation failed to provide factual support to establish that there were any burdens out of proportion to the charitable benefits. The Commonwealth made similar arguments.

Following discovery, each party moved for summary judgment. At argument in the orphans' court, counsel for the Foundation conceded that, as to PNC's fees, "we accept that the *quid pro quo*, the payment of those fees for [PNC's] services rendered, are reasonable. They're market."[11] Following argument, the orphans' court denied the Foundation's motion for summary judgment and its termination petition and granted PNC's and the Commonwealth's motions for summary judgment. The court explained that Wells wanted his charitable trust to continue in perpetuity and did not want to make an outright gift to the Foundation. According to the orphans' court, the trust documents were clear, easily understood, and consistent, and PNC's fees were reasonable.

---

[10] The *parens patriae* power is rooted in the "ancient powers of guardianship over persons under disability and of protectorship of the public interest." *In re: Estate of Pruner*, 136 A.2d 107, 109 (Pa. 1957). As a Pennsylvania charitable trust, the Wells Trust is subject to the Attorney General's oversight. By statute, the Attorney General's interest in the trust is equal to that of the Foundation. *See* 20 Pa.C.S. § 7710(d) ("The Office of Attorney General has the rights of a charitable organization expressly named in the trust instrument to receive distributions from a trust having its situs in this Commonwealth . . . ."). The Attorney General participates as an indispensable party in every proceeding affecting a charitable trust. *In re: Estate of Voegtly*, 151 A.2d 593, 594 (Pa. 1959).

[11] N.T., 8/30/2021; R.R. at 516a.

Because there was no doubt about Wells' intent, the orphans' court believed there was nothing else to consider.[12]

The Foundation appealed. In its statement of errors complained of on appeal,[13] the Foundation asserted that the orphans' court erred by considering Wells' intent which, according to the Foundation, was not relevant. The orphans' court filed a supplemental opinion explaining that none of the Trust's fees or expenses were "unreasonably out of proportion to the charitable benefits" or otherwise "destroying" the Trust.[14]

The Superior Court affirmed.[15] The Foundation argued that the orphans' court erred in denying its request to terminate the Trust because it established all of the requirements of Section 7740.3(e). According to the Foundation, the orphans' court erroneously determined that Wells' intent to create the Trust precluded termination.

The Superior Court noted the "scarcity of case law, in Pennsylvania as well as other jurisdictions, addressing judicial termination of charitable trusts."[16] Finding no factually analogous cases, the Superior Court turned to the sole similar case that it came across: *In re Schlegel*, an orphans' court decision from 2003.[17] In *Schlegel*, the settlor created a charitable trust known as the "Arthur O. and Clara M. Schlegel Memorial Fund

---

[12] *See* Tr. Ct. Op., 9/30/2021, at 7 ("This was a man who clearly knew what he was doing. He was the President of a Bank and Trust Company. Wells wanted to make a gift in trust to his alma mater and he did. There is really nothing else to be considered. Since the language and circumstances surrounding the establishment of the trust leave no doubt as to his intent there is nothing further to analyze.").

[13] *See* Pa.R.A.P. 1925(b).

[14] Tr. Ct. Op., 12/28/2021, at 2 (citing 20 Pa.C.S. § 7740.3(e)).

[15] *Trust B Under Wells*, 282 A.3d 1149. Judge Stabile concurred in the result.

[16] *Id.* at 1157.

[17] No. 36-1990-0184, 2003 WL 26100147 (Pa.Com.Pl. Lancaster Cnty. Feb. 4, 2003).

for Deformed Children of Berks County."[18]  The trust provided that, upon Ms. Schlegel's death, the trustee was to use the income from the trust "to assist in defraying the medical and hospital costs of treating and correcting physical deformities in children residing in Berks County who are either without parents or whose parents are unable financially to meet such expenses."[19]  The trust instrument directed the trustee to follow the recommendations of social service agencies that worked with such children to determine who would receive assistance.

Years later, the trustee sought termination of the trust, asking the orphans court to terminate the trust and to award the assets to the Berks County Community Foundation. The trustee averred that it had experienced difficulty in providing charitable benefits and that termination would accomplish "significant tax savings" because the trust was a private foundation subject to the PFR.[20]  As part of the Berks County Community Foundation, the trust's assets would be maintained as a public charity and would be relieved of these burdens.  In addition, the trustee averred that a successful collaboration between the Berks County Community Foundation and the trust had developed, and that the Berks County Community Foundation and its familiarity with the community would facilitate the charitable benefit intended by the settlor.  The Attorney General did not object.  The orphans' court granted the trust termination, concluding that "pursuit of the settlor's goals and objectives by the present trustee results in expenses and burdens

---

[18]    *Id.* at *1.

[19]    *Id.*

[20]    *Id.* (noting that "the trustee experienced some difficulty in organizing an advisory board of Berks County residents and promoting community awareness of the availability of the fund within the geographical limits provided by the settlor"); *id.* (observing that the trust's status as a private foundation "subjects the trust to an annual excise tax, detailed reporting requirements and limits on its operations").

which are unreasonably disproportionate to the charitable benefits."[21] The court directed the distribution of the balance of the trust to the Berks County Community Foundation to be administered according to the purpose identified in the trust.

The Superior Court in this case held that *Schlegel* was distinguishable and did not support reversal of the orphans' court decision. In particular, in *Schlegel*, the termination petition was unopposed. Although the trustee advanced an argument about the favorable tax treatment that would result from converting the assets from their status as a private foundation to part of a public charity, the trustee also averred that it faced challenges fulfilling the settlor's charitable intent and had established a successful collaboration with the Berks County Community Foundation. Such circumstances were not present here.

Turning to the Foundation's argument that the Trust's expenses would be avoided by a transfer of the assets to the Foundation, the Superior Court disagreed that this was a reason to terminate the Trust. The court reasoned that savings of about $13,450 per year did not prove the existence of "administrative expense or other burdens unreasonably out of proportion to the charitable benefits" as required by Section 7740.3(e).[22]

We granted the Foundation's petition for allowance of appeal to address:

Whether, in a matter of first impression, the Pennsylvania Superior Court erred in its analysis and application of [Section 7740.3(e)] in holding that the [Foundation] is not entitled to the remedies sought by its Motion for Summary Judgment, specifically to include the termination of the Wells Trust with an award of the trust's assets to the [Foundation] to be held on the conditions nearly identical to the terms and conditions set forth in the Wells Trust.[23]

---

[21] *Id.*

[22] *Trust B Under Wells*, 282 A.3d at 1160.

[23] *In re: Trust B Under Agreement of Richard H. Wells*, 293 A.3d 569 (Pa. 2023) (*per curiam*).

## II. Arguments

The Foundation argues that Section 7740.3(e) is unambiguous and provides no room for the orphans' court to consider the settlor's intent to create a trust when deciding whether to terminate the trust. If, as the lower courts held, the settlor's intent to create a trust is paramount, then, according to the Foundation, there would never be any basis for the judicial termination of a charitable trust. The Foundation argues that the only consideration for judicial termination is a comparison of the benefits and the burdens, consideration that the Foundation believes the lower courts ignored.

The Foundation seeks to terminate the Wells Trust and to obtain the Trust's assets for itself in order to be "free of the financial burdens, administrative requirements, taxes, and investment limitations," which the Foundation believes negatively impact the Trust "solely as a result of its separate existence as a trust treated as a Private Foundation under Internal Revenue Code § 4940 *et. seq.*"[24] These burdens include the 1.39 percent excise tax (approximately $4,325 per year), and the mandatory five percent distribution, which the Foundation believes deprives the Trust of flexibility needed to meet its needs and to protect the Trust's assets. The Foundation asserts that, as an endowment, it has a total returns strategy, which the Foundation describes as focusing upon long-term total returns and annual distributions that are based upon a percentage of assets and are derived from both principal and income—a strategy that the Wells Trust cannot pursue.[25] The Foundation desires greater flexibility than the Wells Trust can provide, allowing it to

---

[24]     Foundation's Br. at 6.

[25]     *See* 20 Pa.C.S. § 8113 cmt. (Joint State Gov't Comm'n 2001) ("Accordingly, this provision [of the Principal and Income Act] will provide needed flexibility primarily to those charitable trusts that are not private foundations.").

select a range of investment options and distribution rates.[26] Had Wells known about the ways that the PFR would restrict the Trust, the Foundation believes that Wells would have preferred trust termination.

Addressing PNC's fees, the Foundation argues that its concession that these fees are "market rate" and "reasonable" does not mean that these expenses are not unreasonably out of proportion to the charitable benefit or that Wells' charitable purposes would not be enhanced by the cost savings that would be realized by the transfer of assets to the Foundation. Relying upon an affidavit from VMI's Chief Financial Officer, the Foundation argues that transferring the Trusts' assets would result in annual savings of $13,400 in fees to the outside manager. Added to the other benefits that would result from the transfer of assets, the Foundation predicts that terminating the Trust would result in savings of $17,739 annually.[27]

Turning to the charitable benefits of the Trust, the Foundation argues that these benefits are to be assessed by examining whether the expenses benefit the Trust. The Foundation suggests that any burden that diminishes the trust's assets can have no charitable benefit and, therefore, will always be unreasonably out of proportion to the non-existent charitable benefit. The Foundation sees no benefit to the Trust arising from taxes or expenses. As in *Schlegel*, the Foundation argues that termination is warranted

---

[26]     20 Pa.C.S. § 8113(e) (providing that "the value of the trust shall be the fair market value of the cash and other assets held by the trustee with respect to the trust, whether such assets would be considered 'income' or 'principal,'" and which is "determined at least annually and averaged over a period of three or more preceding years").

[27]     Foundation's Reply Br. at 28.

because it "would accomplish significant tax savings" given the Trust's status as a private foundation.[28]

PNC responds by characterizing the standard necessary for termination under Section 7740.3(e) as heightened, tying termination not just to the existence of burdens, but to the existence of burdens that are "unreasonably out of proportion to" the Trust's charitable benefits.[29] According to PNC, even if this standard is met, the orphans' court has discretion to deny termination.

PNC observes that the legislature enacted Section 7740.3(e) against the backdrop of well-developed common law prioritizing settlor intent, which "supplements" the statutory framework.[30] According to PNC, "[c]onsidering and respecting the settlor's intent in establishing an independently administered perpetual trust serves to uphold the indelible principle that '[e]very person has a right to dispose of his or her own property as he or she sees fit.'"[31]

Driven by well-settled rights and principles, the common law is, according to PNC, particularly solicitous of the settlor's "intent that the trust shall not be terminated," which is evidenced by "the placing of the estate in a trust, and investing the trustee with authority over it."[32] PNC describes the common law's focus on the settlor's intent as being

---

[28] Foundation's Br. at 13 (quoting *Schlegel*, 2003 WL 26100147, at *1 ("It is the contention of the petitioner that the transfer of the trust to the Berks County Community Foundation as requested would accomplish significant tax savings.")).

[29] *See* 20 Pa.C.S. § 7740.3(e).

[30] PNC's Br. at 26 (quoting 20 Pa.C.S. § 7706 ("The common law of trusts and principles of equity supplement this chapter, except to the extent modified by this chapter or another statute of this Commonwealth.")).

[31] *Id.* at 27-28 (quoting *In re: Estate of Paul*, 180 A.2d 254, 262 (Pa. 1962)).

[32] *Id. at 28* (quoting *In re: Baughman's Estate*, 126 A. 58, 64 (Pa. 1924) (internal citations omitted)).

consistent with public policy favoring charitable giving.[33] According to PNC, charities, and, by extension, the public, benefit from the intention of donors who have the prerogative to do as they wish with their own assets, including to create a charitable trust.

Because a settlor presumptively knows that there will be expenses associated with the trust and with having an independent trustee, PNC believes that ordinary trust expenses are consistent with settlor intent and cannot form the basis for trust termination. Wells specifically intended his estate's charitable distributions to be made through a perpetual charitable trust. PNC views the lower courts' resolution of the termination petition as consistent with this intent and the plain language of Section 7740.3(e).

The Commonwealth, as *parens patriae*, agrees with PNC. According to the Commonwealth, the Wells Trust cannot be terminated merely because it is classified as a private foundation under federal law; otherwise, all private foundations would suffer from the same termination-worthy burdens. Had the General Assembly intended to subject all private foundations to termination, the Commonwealth suggests that it could have said so. The Commonwealth asserts that the General Assembly also declined to subject private foundations to termination simply because the beneficiary is capable of managing the assets itself.

The Commonwealth further argues that the five percent mandatory distribution under the PFR is not a burden at all, but a benefit that inures exclusively to the Foundation as sole beneficiary. Additionally, the Commonwealth asserts that there is nothing preventing PNC as the trustee from pursuing a total returns investment strategy.[34] The

---

[33] *See In re Estate of Baum*, 211 A.2d 521, 522 n.2 (Pa. 1965) ("It is difficult to conceive of a Commonwealth public policy that is more fundamental or more meaningful than its frequently restated policy of encouragement to charities and charitable giving in the public interest.").

[34] *See* 20 Pa.C.S. § 8113(a) (permitting "the trustee of a trust held exclusively for charitable purposes" to elect a total returns investment strategy).

Commonwealth believes that none of the burdens upon which the Foundation relies are unreasonable and that, in any case, the orphans' court had the discretion to deny termination based upon its assessment of these alleged burdens.

## III. Discussion

### A. Standard of Review

Summary judgment is appropriate "where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."[35]  The trial court is required to "take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party."[36]  A trial court's entry of summary judgment "may be disturbed by an appellate court only if the court committed an error of law; thus, our standard of review is *de novo*, and our scope of review is plenary."[37]

This appeal requires us to interpret and apply the UTA, an endeavor that is guided by the Statutory Construction Act.[38]  The object of interpretation and construction of statutes "is to ascertain and effectuate the intention of the General Assembly and . . . the plain language of the statute is generally the best indicator of such intent."[39]  "We will only look beyond the plain meaning of the statute where the words of the statute are unclear or ambiguous."[40]

---

[35]   *Nicolaou v. Martin*, 195 A.3d 880, 891 (Pa. 2018); *see also* Pa.R.Civ.P. 1035.2(1).

[36]   *Maas v. UPMC Presbyterian Shadyside*, 234 A.3d 427, 436 (Pa. 2020).

[37]   *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 647 (Pa. 2009) (internal citations omitted).

[38]   1 Pa.C.S. §§ 1501-1991.

[39]   *Commonwealth v. Zortman*, 23 A.3d 519, 525 (Pa. 2011) (citing 1 Pa.C.S. § 1921(a), (b)).

[40]   *Id.* (citing 1 Pa.C.S. § 1921(c)).

## B. Common law

There is no factual dispute that Wells intended to create a perpetual charitable trust. Wells was well-versed in the language and structure of trusts. Not only was Wells the long-term and successful president of a bank and trust company, but he demonstrated his aptitude in this regard with multiple revisions, refining over time his intentions as settlor. Wells designated his company, First Seneca (now PNC), to serve as trustee, and he directed that the trustee would receive reasonable compensation.

In the first version of his trust, Wells required the trustee to pay whatever principal remained in the trust to VMI directly. However, in the 1960, 1961, and 1963 amendments, Wells chose not to make any gifts to VMI directly but, instead, to create a generalized charitable trust with favorable consideration to the needs of VMI. In the final amendment, Wells again opted not to make an outright gift to VMI but to benefit the Foundation as the sole beneficiary of the perpetual charitable trust. Wells further amended the Trust to expand upon the reasonable compensation owed to the trustee so as to include a commission computed on the income and corpus under a schedule of compensation in effect when the services were performed.

When Mrs. Wells died in 2004, the Foundation became the sole beneficiary of the Trust, receiving an equitable right to derive benefits from the property held in trust.[41] This is exactly how Wells intended it to be when he unambiguously created the perpetual charitable trust and provided for the periodic distribution of trust income to the Foundation

---

[41] *See Lewis v. Alexander*, 685 F.3d 325, 332 (3d Cir. 2012) ("Th[e] structure [of a trust] means that the beneficiary does not actually own the assets of the trust, but instead has an equitable right to derive benefits from them.").

in perpetuity.[42] It is not disputed that Wells intended to create a perpetual charitable trust with a single beneficiary and that terminating the Trust would be contrary to this intent.

Notwithstanding Wells' indisputable intent, Section 7740.3(e) of the UTA provides authority for a court to terminate his trust. The UTA is premised upon the Uniform Trust Code ("UTC"), a "comprehensive" national model proposed for codification of the common law of trusts, which model "applies generally to all trusts."[43] The UTA and the UTC both provide that "[t]he common law of trusts and principles of equity supplement" the legislation, "except to the extent modified" by statute.[44] To understand the meaning of Section 7740.3(e), it is helpful to review the common law that continues to supplement the UTA, as well as the relevant provisions of the UTC.

The common law meaning of a trust is "a relation between two persons, by virtue of which one of them as trustee holds property for the benefit of the other. . . . There must be sufficient words to raise a trust, property to be subject to it, and a purpose to be accomplished."[45] A trust creates two primary interests: the interest of the settlor in creating the trust, transferring interest in trust property, and establishing the conditions of the trust; and the interest of the beneficiary in enjoying the benefit to which the trust is directed.[46] The trustee has a derivative interest "in performing the agreed duty to

---

[42] *See* Amendment to Revocable Trust Agreement, 7/7/1965, at 4, Article I.B.5; R.R. at 36a; *see also id.* at 6, Article VIII; R.R. at 38a.

[43] *Trust Under Agreement of Taylor*, 164 A.3d 1147, 1149 (Pa. 2017) (internal quotations omitted); *see also In re Trust of Garrison*, 288 A.3d 866, 872 (Pa. 2023) (describing the UTC as codifying "the consensus of common law principles then governing the law of trusts").

[44] 20 Pa.C.S. § 7706; *see also* UNIF. TR. CODE § 106 (UNIF. L. COMM'N 2000).

[45] *In re Passarelli Family Trust*, 242 A.3d 1257, 1269 (Pa. 2020) (quoting *In re Vosburgh's Estate*, 123 A. 813, 815 (Pa. 1924)).

[46] *Garrison*, 288 A.3d at 872.

administer the trust assets for the benefit of the beneficiaries in accordance with the terms established by the settlor."[47]

When construing a trust, "[t]he intent of the settlor, if not contrary to law, must prevail."[48] The best evidence of the settlor's intent is the trust instrument itself.[49] Because of the well-established rights of settlors to dispose of their property through trust,[50] the common law is particularly solicitous of the settlor's "intent that the trust shall not be terminated," an intent evidenced by the creation of the trust in the first instance.[51] For more than a century, the common law has recognized that a beneficiary of a charitable trust has no right to demand the termination of the trust and the award of assets.[52] Under

---

[47] *Id.*

[48] *In re Trust of Tracy*, 346 A.2d 750, 752 (Pa. 1975); *see also In re Estate of Burleigh*, 175 A.2d 838, 839 (Pa. 1961) ("[T]he testator's intent is the polestar and must prevail.").

[49] *See Farmers Tr. Co. v. Bashore*, 445 A.2d 492, 494 (Pa. 1982) ("A settlor's intent is to be determined from all the language within the four corners of the trust instrument, the scheme of distribution and the circumstances surrounding the execution of the instrument."); *In re Girard Tr. Corn Exch. Bank*, 208 A.2d 857, 859 (Pa. 1965) ("Admission of evidence to show the intent of the settlor is the exception and not the rule for the sound reason that the writing itself must be considered to be the best and controlling evidence of the settlor's intent."); *Cf. Burleigh*, 175 A.2d at 839 ("It is now hornbook law . . . that the testator's intent . . . must be gathered from a consideration of (a) all the language contained in the four corners of [the] will and (b) [the] scheme of distribution and (c) the circumstances surrounding" the testator at the time the will was made and "(d) the existing facts . . . .").

[50] *See, e.g., Paul*, 180 A.2d at 262 ("Every person has a right to dispose of his or her own property as he or she sees fit."); *In re Covington's Estate*, 33 A.2d 235, 242 (Pa. 1943) (because an individual has the right to dispose of property, the owner's "directions" are "scrupulously observed by those who administer the law").

[51] *Baughman's Estate*, 126 A. at 64.

[52] *See In re Yeager's Estate*, 47 A.2d 813, 815 (Pa. 1946) ("A trust to pay the income to a charitable institution forever is an active trust which may not be terminated by the demand of the institution that the principal be paid to it, even with the consent of the trustee."); *In re Unruh's Estate*, 93 A. 1000, 1001 (Pa. 1915) (noting the "wide distinction between a gift to a charity and a gift to a trustee to be applied to a charity," and recognizing that, were the court to "terminate the trust and order the transfer of the assets to the (continued…)

the common law, a "trust cannot be terminated if it would frustrate the testator's purpose in creating the trust."[53]

Although beneficiaries had no common law right to terminate a trust and to obtain the assets outright, the common law doctrines of equitable deviation and *cy pres* empowered courts to modify the terms of a trust in particular circumstances. Equitable deviation permitted a court to alter the provisions of a charitable trust to account for unanticipated circumstances in order to give effect to what the settlor probably would have intended had the settlor anticipated the circumstances.[54] *Cy pres* empowered the court to reform a trust when changed circumstances made implementation of the settlor's

---

charitable beneficiary, we would not only be defeating the intention of the testatrix, but would also deprive the ultimate objects of her bounty . . . of the supervision and control which we have over trustees").

[53] *In re Estate of Davis*, 297 A.2d 451, 455 (Pa. 1972); *see also In re Tr. Estate of Grote*, 135 A.2d 383, 391 (Pa. 1957) ("This Court has wisely limited and restricted the termination of testamentary trusts whenever it could reasonably be said that one or more of the ultimate purposes of the testator for keeping the trust alive has not been fully accomplished."); *In re Craig's Estate*, 52 A.2d 650, 651 (Pa. 1947) ("If this testatrix's gift had been to a trustee . . . we would be bound to sustain the trust in the hands of such trustee and refuse any request by the church or its successor for the possession of the assets, whether in the guise of a substituted trustee or otherwise."); *Baughman's Estate*, 126 A. at 64 ("A substituted method is not [the settlor's] method, and is not permissible, unless necessary to give effect to [the settlor's] expressed purpose."); Ronald Chester, *Modification and Termination of Trusts in the 21st Century: The Uniform Trust Code Leads a Quiet Revolution*, 35 REAL PROP. PROB. & TR. J. 697, 701 (2001) (describing "the American rule that blocks trust termination (or even modification) when it contravenes settlor intent").

[54] *See* RESTATEMENT (THIRD) OF TRUSTS § 66 cmt. a (AM. L. INST. 2003) ("The objective is to give effect to what the settlor's intent probably would have been had the circumstances in question been anticipated.").

express directions impossible, illegal, or impracticable to implement.[55] Although the doctrine of *cy pres* is imprecise, it endeavors to approximate the intention of the settlor.[56]

### C. The Uniform Trust Code and the Uniform Trust Act

Against this common law background, the National Conference of Commissions on Uniform State Laws proposed codification of several means for termination or modification of charitable and noncharitable trusts. Some of these the General Assembly adopted verbatim in the UTA; others the General Assembly changed in significant ways before adoption. Under the UTA, a trust may be modified or terminated only in defined circumstances and under precise standards.[57] For example, a noncharitable trust may

---

[55] As this Court has explained:

> If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general charitable intention of the settlor.

*In re Women's Homeopathic Hosp. of Phila.*, 142 A.2d 292, 294 (Pa. 1958); *see also Manners v. City of Phila. Libr. Co.*, 93 Pa. 165, 1880 WL 13288, at *8 (Pa. 1880) (*Cy pres* "is a rule of law and equity that where a vested estate is distinctly given, and there are annexed to it conditions . . . that are not allowed by law[,] . . . these restraints . . . are void").

[56] *See Women's Homeopathic Hosp.,* 142 A.2d at 294 (under *cy pres*, the court exercises its discretion "in such a manner as to award the fund to an eleemosynary institution whose services will most nearly approximate the intention of the donor."); *In re Williams' Estate*, 46 A.2d 237, 239 (Pa. 1946) (*Cy pres* "is the doctrine of approximation."); *In re Trust of Farrow*, 602 A.2d 1346, 1348 (Pa. Super. 1992) (providing that, when a trust cannot be administered "in exact conformity to the scheme of the person or persons who have provided for it, it must be performed with as close approximation to that scheme as reasonably practicable").

[57] *See* 20 Pa.C.S. § 7736 (providing that a trust is voidable "to the extent its creation was induced by fraud, duress or undue influence"); 20 Pa.C.S. § 7740(a) (providing that, if the trust instrument itself directs that it is to continue for a finite period of time, then the expiration of that time terminates the trust); *id.* (requiring a trust to terminate to the extent that "the purposes of the trust have become unlawful or contrary to public policy"); *see also* UNIF. TR. CODE §§ 406, 410.

be terminated in varying circumstances, depending upon whether the termination is: (a) upon the consent of the settlor and all of the beneficiaries;[58] (b) with the consent of the beneficiaries but without the concurrence of the settlor;[59] or (c) without the consent of all beneficiaries.[60]

In certain circumstances, the General Assembly has required that modification or termination be premised upon effectuating the settlor's intent. For example, if a charitable trust does not indicate a beneficiary or charitable purpose, nor authorize the trustee to select a beneficiary or charitable purpose, Section 7735(b) empowers the court to make the selection "consistent with the settlor's intention to the extent it can be ascertained."[61] Section 7740.5 allows a court to reform a trust "to conform to the settlor's probable intention" if the intent expressed in the trust instrument was affected by a mistake of fact or law.[62] Under Section 7740.6, a court may modify a trust "in a manner that is not contrary to the settlor's probable intention in order to achieve the settlor's tax objectives."[63]

---

[58]     20 Pa.C.S. § 7740.1(a) ("A noncharitable irrevocable trust may be modified or terminated upon consent of the settlor and all beneficiaries even if the modification or termination is inconsistent with a material purpose of the trust."); *see also* UNIF. TR. CODE § 411(a).

[59]     20 Pa.C.S. § 7740.1(b) (Termination in this context is premised upon a judicial finding that "continuance of the trust is not necessary to achieve any material purpose of the trust."); *see also* UNIF. TR. CODE § 411(b). A "material purpose of the trust" includes a spendthrift provision. 20 Pa.C.S. § 7740.1(b.1).

[60]     20 Pa.C.S. § 7740.1(d) (without the consent of the beneficiaries, the court "may" approve modification or termination "only if the court is satisfied that: (1) if all the beneficiaries had consented, the trust could have been modified or terminated under this section; and (2) the interests of a beneficiary who does not consent will be adequately protected"); *see also* UNIF. TR. CODE § 411(e).

[61]     20 Pa.C.S. § 7735(b); *see also* UNIF. TR. CODE § 405(b).

[62]     20 Pa.C.S. § 7740.5; *see also* UNIF. TR. CODE § 415.

[63]     20 Pa.C.S. § 7740.6: *see also* UNIF. TR. CODE § 416.

Section 7740.2(a) codifies equitable deviation for noncharitable trusts due to unanticipated circumstances in order to "approximate the settlor's probable intention."[64] Section 7740.2(a) is modeled on Section 412 of the UTC, which permits the equitable deviation of charitable and noncharitable trusts alike.[65]  In enacting Section 7740.2(a), however, the General Assembly chose to limit the remedy of equitable deviation to noncharitable trusts.

### D. Judicial termination under Section 7740.3(e)

Section 7740.3 pertains only to charitable trusts, and it codifies the common law doctrine of *cy pres* as well as administrative deviation, the termination of small trusts, and judicial termination:

> (a) General rule.--Except as otherwise provided in subsection (b), if a particular charitable purpose becomes unlawful, impracticable or wasteful:
>
>> (1) the trust does not fail, in whole or in part;

---

[64]     Section 7740.2(a) provides:

The court may modify the administrative or dispositive provisions of a noncharitable irrevocable trust, make an allowance from the principal of the trust or terminate the trust if, because of circumstances that apparently were not anticipated by the settlor, modification, allowance or termination will further the purposes of the trust.  To the extent practicable, the modification or allowance shall approximate the settlor's probable intention.

20 Pa.C.S. § 7740.2(a).

[65]     Section 412(a) of the UTC provides:

The court may modify the administrative or dispositive terms of a trust or terminate the trust if, because of circumstances not anticipated by the settlor, modification or termination will further the purposes of the trust.  To the extent practicable, the modification must be made in accordance with the settlor's probable intention.

UNIF. TR. CODE § 412(a).  As the UTC comment explains, "the purpose of the 'equitable deviation' authorized by subsection (a) is not to disregard the settlor's intent but to modify inopportune details to effectuate better the settlor's broader purposes."  UNIF. TR. CODE § 412 cmt.

(2) the trust property does not revert to the settlor or the settlor's successors in interest; and

(3) the court shall apply *cy pres* to fulfill as nearly as possible the settlor's charitable intention, whether it be general or specific.

(b) Exception.--A provision in the terms of a charitable trust that would result in distribution of the trust property to a noncharitable beneficiary prevails over the power of the court under subsection (a) to apply *cy pres*.

(c) Administrative deviation.--A court may modify an administrative provision of a charitable trust to the extent necessary to preserve the trust.

(d) Administrative termination of small charitable trusts.--A trust solely for charitable purposes having assets of less than $100,000 may be terminated at its inception or at any time thereafter by the trustee with the consent of the Attorney General and all charitable organizations that are designated as beneficiaries by name in the trust instrument. Upon termination, the assets, subject to the approval of the Attorney General, shall be delivered to the organizations, if any, designated in the trust instrument or, if none, to organizations selected by the trustee, in either case to be held and applied for the general or specific charitable purposes and on the terms that will, in the trustee's discretion, fulfill as nearly as possible the settlor's intention.

(e) Judicial termination of charitable trusts.--If the separate existence of a trust, whenever created, solely for charitable purposes results or will result in administrative expense or other burdens unreasonably out of proportion to the charitable benefits, the court may, upon application of the trustee or any interested person and after notice to the Attorney General, terminate the trust, either at its inception or at any time thereafter, and award the assets outright, free of the trust, to the charitable organizations, if any, designated in the trust instrument or, if none, to charitable organizations selected by the court, in either case for the purposes and on the terms that the court may direct to fulfill as nearly as possible the settlor's intentions other than any intent to continue the trust, if the court is satisfied that the charitable organizations will properly use or administer the assets.[66]

Subsections (a) and (b) are modeled upon Section 413 of the UTC, and they recognize that strict adherence to a settlor's intended charitable purpose may not always be possible because of changing circumstances that arise after the settlor's intent is

---

[66]    20 Pa.C.S. § 7740.3.

memorialized in the trust.[67]  Where the particular charitable purpose has become "unlawful, impracticable or wasteful," Section 413 of the UTC gives courts the *cy pres* power to modify or terminate (in whole or in part) a charitable trust in order to effectuate the settlor's charitable intentions.[68]  Under such circumstances, and in the absence of contrary language, Section 7740.3(a) and (b) presume that the settlor would prefer that the gift be used for other charitable purposes rather than to see the trust fail, and accordingly empower the court to alter the purpose to which a charitable trust's assets

---

[67]     *See* UNIF. TR. CODE § 413 cmt.  Section 413 provides:

(a) Except as otherwise provided in subsection (b), if a particular charitable purpose becomes unlawful, impracticable, impossible to achieve, or wasteful:

>    (1) the trust does not fail, in whole or in part;

>    (2) the trust property does not revert to the settlor or the settlor's successors in interest; and

>    (3) the court may apply cy pres to modify or terminate the trust by directing that the trust property be applied or distributed, in whole or in part, in a manner consistent with the settlor's charitable purposes.

(b) A provision in the terms of a charitable trust that would result in distribution of the trust property to a noncharitable beneficiary prevails over the power of the court under subsection (a) to apply cy pres to modify or terminate the trust only if, when the provision takes effect:

>    (1) the trust property is to revert to the settlor and the settlor is still living; or

>    (2) fewer than 21 years have elapsed since the date of the trust's creation.

UNIF. TR. CODE § 413.

[68]     *See* UNIF. TR. CODE § 413 cmt.  *Cy pres* empowers the court in its discretion to terminate the trust and to distribute the assets "to other charitable entities."  *Id.*  The court also may order "partial termination" if "the trust property is more than sufficient to satisfy the trust's current purposes."  *Id.*

are to be applied.[69]  Equitable deviation for noncharitable trusts[70] and *cy pres* for charitable trusts both permit a court to alter the trust's provisions due to unforeseen circumstances, in order to further the intended purpose of the trust.

The General Assembly has authorized the administrative deviation of charitable trusts in Section 7740.3(c), permitting the modification of administrative provisions in order to preserve the trust.  The General Assembly accounted for the administrative deviation of noncharitable trusts in Section 7740.2(b).  This is a departure from the UTC, which provides for the administrative deviation of charitable and noncharitable trusts alike in Section 412(b).[71]

Section 7740.3(d) authorizes the administrative termination of small charitable trusts.  Even in this categorical termination provision, the beneficiary cannot unilaterally decide that it would prefer that the trust be terminated.  The burden is on the trustee to establish that the assets of the trust are less than $100,000 and to obtain the consent of the Attorney General and the beneficiaries.[72]  Section 7740.3(d) parallels Section 7740.4(a), which pertains exclusively to noncharitable trusts.  Section 7740.4(a) authorizes a trustee to terminate a noncharitable trust when "the value of the trust property

---

[69]     *See* 15 AM. JUR. 2d *Charities* § 149.

[70]     20 Pa.C.S. § 7740.2(a).

[71]     *Compare* 20 Pa.C.S. § 7740.3(c), *with* 20 Pa.C.S. § 7740.2(b) ("The court may modify the administrative provisions of a noncharitable irrevocable trust if adherence to the existing provisions would be impracticable or wasteful or impair the trust's administration.").  The UTC provides for the administrative deviation of charitable and noncharitable trusts in Section 412(b).  UNIF. TR. CODE § 412(b) (providing that the "court may modify the administrative terms of a trust if continuation of the trust on its existing terms would be impracticable or wasteful or impair the trust's administration.").

[72]     20 Pa.C.S. § 7741.3(d).

is insufficient to justify the cost of administration" and no beneficiary objects.[73]  The court also may terminate a noncharitable trust under Section 7740.4(b) "if it determines that the value of the trust property is insufficient to justify the cost of administration."[74]  The General Assembly has made the legislative determination that all charitable trusts having assets less than $100,000 are likely to be inefficient to administer and may be terminated.

Judicial termination of charitable trusts under Section 7740.3(e)—the provision at issue here—proceeds in two parts: termination and distribution.  The termination provision requires an examination of whether the trust's "separate existence" results in "administrative expense or other burdens" that are "unreasonably out of proportion" to the trust's "charitable benefits."[75]  If so, then the court "may" terminate the trust and proceed to the distribution provision, awarding the assets outright to the beneficiary to fulfill "as nearly as possible the settlor's intentions other than any intent to continue the trust."[76]  The statute operates to permit the court to set aside the settlor's intent "to continue the trust" only after the court, in its discretion, determines that the balancing referenced in the termination provision weighs in favor of termination.

---

[73]     20 Pa.C.S. § 7740.4(a).  The UTC provision upon which Section 7740.4(a) is modeled applies to all trusts, whereas Section 7740.4(a) applies only to noncharitable trusts.  *See* UNIF. TR. CODE § 414(a) ("After notice to the qualified beneficiaries, the trustee of a trust consisting of trust property having a total value less than [$50,000] may terminate the trust if the trustee concludes that the value of the trust property is insufficient to justify the cost of administration.").  The General Assembly codified the termination of noneconomic charitable trusts in Section 7740.3(d).

[74]     20 Pa.C.S. § 7740.4(b).  The UTC provision upon which Section 7740.4(b) is modeled applies to all trusts.  UNIF. TR. CODE § 414(b) ("The court may modify or terminate a trust or remove the trustee and appoint a different trustee if it determines that the value of the trust property is insufficient to justify the cost of administration.").

[75]     20 Pa.C.S. § 7740.3(e).

[76]     *Id.*

Judicial termination of charitable trusts under the UTA has no direct counterpart in the UTC. The "unreasonably out of proportion standard" of Section 7740.3(e) is an invention of our General Assembly. Here, we construe the plain language of that statute. It is not merely when the burdens are out of proportion to the charitable benefit that termination is warranted under Section 7740.3(e). Rather, the General Assembly has required that disproportion to be "unreasonable" before the court has any discretion to terminate. "Unreasonable" generally is understood to be a heightened standard, one that intentionally is difficult to meet.[77] "Unreasonable" suggests the absence of reason.[78]

The factors that the court expressly is required to consider before terminating a trust—the trust's separate existence, expense and burdens, unreasonable disproportionality, and charitable benefits—do not include the settlor's intent to continue the trust. This represents a departure from judicial termination of charitable trusts under the common law, a statutory "modification" of "the common law of trusts and principles of equity."[79]

The General Assembly has required the consideration of settlor intent in other scenarios, indicating its willingness to do so when intent matters.[80] For example, within the same section, the General Assembly has made settlor intent relevant for Section

---

[77]     See, e.g., *Mays v. Hines*, 592 U.S. 385, 391 (2021) (describing "unreasonable" as a standard that is "difficult to meet").

[78]     See Bryan Garner, A DICTIONARY OF MODERN LEGAL USAGE (2d.ed. 1995) (defining "unreason" as "absence of reason; indisposition or inability to act or think rationally or reasonably;" and "unreasonableness" as "an act not in accordance with reason or good sense," or "the fact of going beyond what is reasonable or equitable"); BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "unreasonable" as "[n]ot guided by reason; irrational or capricious"); OXFORD ENGLISH DICTIONARY (2020 ed.) (defining "out of proportion" as "lacking, or so as to lack, appropriate relation (to something else); unbalanced, disproportionate, esp. disproportionately large; exaggerated, overemphasized").

[79]     20 Pa.C.S. § 7706.

[80]     See 20 Pa.C.S. §§ 7735(b), 7740.2(a), 7740.3(a), 7740.5, and 7440.6.

7740.3(a). The termination provision of Section 7740.3(e) leaves no room for the consideration of settlor intent. By definition, judicial termination results in the award of "assets outright, free of the trust," in contravention of the settlor's intent to continue the trust. The General Assembly has accounted for the settlor's intent not by requiring independent judicial consideration of intent, but by imposing a heightened standard that must be met in order to abrogate this intent. Judicial termination in derogation of the settlor's intent to continue the trust is permissible only in the narrow circumstances and under the heightened standard established by Section 7740.3(e).

The "unreasonably out of proportion" standard protects the settlor's intent to continue the trust by requiring a showing that a charitable trust's "administrative expense or other burdens" are so excessive as compared to the charitable benefits that it becomes unreasonable to persist. Any rational or non-excessive discrepancy between the burdens and benefits would not suffice. A "burden" is not "unreasonably out of proportion," and does not permit termination, unless the trust's "separate existence" essentially defeats the "charitable benefits" established by the trust. If the court weighs the burdens and the benefits and finds the burdens to be unreasonably out of proportion to the benefits, the court "may" in its discretion proceed to the distribution prong and "award the assets outright" to the beneficiary.

The lower courts in this case rejected termination in part because termination would be inconsistent with the settlor's intent to continue the trust. It is not disputed that termination would violate Wells' intent. Termination will always be contrary to the settlor's intent. If the settlor's intent to continue a trust, standing alone, could defeat judicial termination, termination would never be warranted under Section 7740.3(e), and the judicial termination provision would be meaningless. Instead of enacting an

inconsequential statute, the General Assembly deemed judicial termination in derogation of settlor intent to be warranted when the high standard of Section 7740.3(e) is satisfied.

We agree with the Foundation that the settlor's intent to continue the trust does not independently defeat termination under Section 7740.3(e). But that does not end the matter. It is the Foundation's burden, as the moving party and the appellant, to establish that the trial court abused its discretion in weighing the burdens and the benefits or in denying termination. The Foundation asserts that it established unreasonable disproportion because terminating the Trust and handing the assets to the Foundation would avoid the 1.39 percent federal excise tax as well as the mandatory five percent annual distribution and the concomitant lack of investment flexibility that results from the PFR.

The Wells Trust and the Foundation are both tax-exempt charitable organizations under Section 501(c)(3) of the Internal Revenue Code.[81] Charitable organizations described in Section 501(c)(3) are divided into two classes: private foundations and "other than" private foundations, which include public charities.[82] Public charities such as the Foundation have escaped the private foundation designation by showing that they are supported by the public. Private foundations like the Wells Trust "typically have a single major source of funding" and "have as their primary activity the making of grants to other charitable organizations and to individuals."[83]

With the Tax Reform Act of 1969, Congress created a rigid regime of regulation for private foundations such as the Wells Trust, a regime borne of "deep distrust of private

---

[81]     *See* 26 U.S.C. § 501(c)(3).

[82]     26 U.S.C. § 509(a) (defining "private foundation" as all organizations described in 501(c)(3) "other than" specifically excluded organizations).

[83]     *Public Charities*, IRS, https://www.irs.gov/charities-non-profits/charitable-organizations/public-charities (last visited March 18, 2024).

foundations."[84] Although the Wells Trust is subject to the PFR, the Foundation is not. The PFR create a tax regime governing private foundations and impose substantial penalties for those that fail to comply. In particular, the PFR impose an excise tax;[85] prohibitions upon self-dealing between the private foundation and certain "disqualified persons;"[86] annual minimum distribution requirements;[87] penalties upon on the failure to make annual distributions;[88] penalties for excess business holdings;[89] penalties for investments that jeopardize the charitable purpose;[90] and taxes upon taxable expenditures.[91] Violations result in graduated penalties.[92]

The PFR impose an annual excise tax of 1.39 percent upon the net investment income of the Wells Trust, which is defined as the amount by which gross income and capital gain net income exceed certain allowable deductions.[93] The Foundation's Chief Financial Officer estimated that the excise tax burdens the Wells Trust in the amount of approximately $4,325 annually.[94] Neither PNC nor the Commonwealth dispute this figure.

---

[84] James J. Fishman, *The Private Foundation Rules at Fifty: How Did We Get Them and Do They Meet Current Needs?* 17 Pitt. Tax. Rev. 247, 269 (2020).

[85] 26 U.S.C. § 4940 (entitled "Excise tax based on investment income").

[86] *Id.* at §§ 4941, 4946(a)(1).

[87] *Id.* at § 4942.

[88] *Id.*

[89] *Id.* at § 4943.

[90] *Id.* at § 4944.

[91] *Id.* at § 4945.

[92] *Id.* at § 4942(a) and (b).

[93] *Id.* at § 4940(a), (c).

[94] Foundation's Br. in Support of Summary Judgment, Ex. 1, Aff. of David L. Prasnicki at 3; R.R. at 89a.

The purported lack of investment flexibility caused by the PFR and the five percent distribution required thereunder are less straightforward and not entirely separable. The Foundation has not sought to quantify these purported burdens. Section 4942 of the Internal Revenue Code requires private foundations to make annual distributions of five percent of the aggregate fair market value of the trust's assets over the trust's indebtedness.[95] This provision ensures that private foundations give a minimum amount of their assets to their charitable activities or beneficiaries instead of simply increasing the value of the trust.[96]

The Foundation asserts that, because the Wells Trust is a private foundation subject to the PFR and the mandatory five percent distribution, the Trust cannot avail itself of the total returns investment policy permitted under Section 8113 of the Principal and Income Act.[97] As a public charity, the Foundation asserts that it would be free to proceed under Section 8113.

---

[95]    *See* 26 U.S.C. § 4942(e)(1).

[96]    Failing to make mandatory distributions will result in initial penalties of 30%, with subsequent penalties increasing to 100%. *Id.* § 4942(a), (b). This graduated penalty scheme is "one of the most unique innovations" related to the Tax Reform Act of 1969. Fishman, *The Private Foundation Rules*, 17 PITT. TAX. REV. at 277. Under this regime, there is an initial penalty, and an opportunity to seek mitigation of that penalty. "Those who do not correct or are repeat offenders are subject to a much higher [penalty]. Only the most egregious violators of the [PFR] face loss of tax-exempt status and possibly the confiscation of assets." *Id.*

[97]    *See* 20 Pa.C.S. § 8113. This section provides:

(a) Election.--Notwithstanding the foregoing provisions of this chapter, the trustee of a trust held exclusively for charitable purposes may elect to be governed by this section unless the governing instrument expressly provides that the election provided by this section shall not be available.

(b) Eligibility for election.--To make an election under this section, the trustee shall adopt and follow an investment policy seeking a total return for the investments held by the trust, whether the return is to be derived from appreciation of capital or earnings and distributions with respect to capital
(continued…)

Section 8113 of the Principal and Income Act was adopted in 2002, and provides that a trustee of a charitable trust "may elect to be governed by" Section 8113.[98] If the trustee makes this election, then the trustee is permitted to "adopt and follow an

---

or both. The policy constituting the election shall be in writing, shall be maintained as part of the permanent records of the trust and shall recite that it constitutes an election to be governed by this section.

(c) Effect of election.--

> (1) If an election is made to be governed by this section, the term "income" shall mean a percentage of the value of the trust.

> (2) Except as otherwise provided in paragraph (3), the trustee shall, in a writing maintained as part of the permanent records of the trust, select the percentage and determine that it is consistent with the long-term preservation of the real value of the principal of the trust but in no event shall the percentage be less than 2% nor more than 7% per year.

> \* \* \*

> (4) The term "principal" shall mean all other assets held by the trustee with respect to the trust. The selection may be made either annually or subject to change only when the trustee deems such change necessary and prudent.

> \* \* \*

(e) Value determination.--For purposes of applying this section, the value of the trust shall be the fair market value of the cash and other assets held by the trustee with respect to the trust, whether such assets would be considered "income" or "principal" under the other provisions of this chapter, determined at least annually and averaged over a period of three or more preceding years. However, if the trust has been in existence less than three years, the average shall be determined over the period during which the trust has been in existence.

(f) Charitable organizations.--For a charitable organization defined under Chapter 79 (relating to charitable instruments) the provisions of Chapter 79 shall supersede subsection (c) if necessary to comply with the minimum investment return requirements.

20 Pa.C.S. § 8113.

[98]     *Id.* § 8113(a).

investment policy seeking a total return for the investments held by the trust, whether the return is to be derived from appreciation of capital or earnings and distributions with respect to capital or both."[99]   If the trustee makes this election, then Section 8113 redefines the term "income" to mean between two and seven percent of the trust's value, depending upon the percentage chosen by the trustee.[100]   Under this election, the value of the trust is the "fair market value of the cash and other assets held by the trustee with respect to the trust," regardless of "whether those assets are 'income' or 'principal' . . . , determined at least annually and averaged over a period of three or more preceding years."[101]

If the five percent minimum distribution required by the PFR exceeds the distribution that otherwise would be made because of an election under Section 8113, the trustee must comply with the federally mandated distribution.[102]   In a Joint Statement issued in connection with the 2002 enactment of Section 8113, the Joint State Government Commission explained that:

> The above rules are necessary only in connection with trusts which state that only the income can be expended currently.  Trusts which allow the application of both principal and income can be managed on a total return basis in any event.  In addition, charitable trusts that are private foundations for Federal income tax purposes already have the ability to expend "principal" to the extent provided in [20 Pa.C.S. § 7903].  Accordingly, this provision will provide needed flexibility primarily to those charitable trusts that are not private foundations.[103]

---

[99]     *Id.* § 8113(b).

[100]    *Id.* § 8113(c)(1), (2).

[101]    *Id.* § 8113(e).

[102]    *Id.* §§ 8113(f), 7903(a)(1); 26 U.S.C. § 4942.

[103]    20 Pa.C.S. § 8113 cmt. (Joint State Gov't Comm'n 2001).

Although the Foundation argues that the PFR deny the Wells Trust "'needed flexibility' derived from access to the investment management framework set forth in [Section 8113],"[104] it is not clear that the Wells Trust is barred from making an election under Section 8113. Section 8113(a) facially permits a trustee of a private foundation to elect to be governed by Section 8113. For charitable organizations defined under Chapter 79, the provisions of Chapter 79 supersede the effect of an election under Section 8113 only "if necessary to comply with the minimum investment return requirements."[105] Chapter 79 defines charitable organizations to include private foundations subject to the PFR.[106] The trust document governing a private foundation "is deemed to include provisions" conforming to the PFR.[107] For private foundations such as the Wells Trust, therefore, the trust document is deemed to include the distributions required to satisfy the PFR, and the PFR will supersede the effect of an election under Section 8113 to the extent necessary to comply with the PFR's mandatory five percent distribution.

According to the Commonwealth as the public supervisor of charitable trusts, if the total returns election would result in an annual distribution that was lower than the five percent required by the PFR, then the PFR would supersede the election under Section 8113. If the total returns election under Section 8113 would result in distribution higher than the five percent required by the PFR, then the PFR would not supersede the election

---

[104]     Foundation's Br. at 48 (quoting 20 Pa.C.S. § 8113 cmt. (Joint State Gov't Comm'n 2001)).

[105]     20 Pa.C.S. § 8113(f).

[106]     *Id.* § 7902.

[107]     *Id.* § 7903(a)(1) ("The governing instrument of a charitable organization is deemed to include provisions, the effects of which are to: (1) Require distributions for each taxable year in such amounts and at such times and in such manner as not to subject the organization to [penalties under the PFR].").

under Section 8113. It is not as apparent, as the Foundation asserts, that an election under Section 8113 is unavailable to the Wells Trust.

The Foundation also argues that the PFR deny the flexibility afforded in Section 8113 to vary the annual distributions between two and seven percent and to average the value of the trust over the prior three years. Again, this is true only if the total returns under Section 8113 are less than those mandated by the PFR. If the total returns exceed those mandated by the PFR, then the increased distributions would not burden the Trust, but would benefit it.

The Foundation believes that the PFR pose a risk to the Wells Trust's ability to maintain the "real value" of the principal because they deprive the Trust of the definition of "income" provided in Section 8113(c)(1).[108] Under Section 4942(e)(1) of the PFR, the annual distribution is derived from the trust's fair market value.[109] Under Section 8113, the trust's "income" is defined as a percentage of the fair market value of the trust.[110] Although the Foundation's position in this regard is not entirely clear, it appears that the Foundation views the PFR as a burden because they permit the principal to be invaded to meet the five percent annual distribution requirement. However, the election permitted by Section 8113 also requires the annual distribution of income that is defined to include

---

[108]　*See* Foundation's Br. at 51 ("The arbitrary 5% distribution requirement of the Private Foundation Rules under the Internal Revenue Code poses a risk to the Wells Trust's ability to maintain the 'real value' of the principal of the Wells Trust, contrary to the Total Return Statute.").

[109]　26 U.S.C. § 4942(e)(1) (providing that "the minimum investment return for any private foundation for any taxable year is 5 percent of the excess of (A) the aggregate fair market value of all assets of the foundation other than those which are used (or held for use) directly in carrying out the foundation's exempt purpose, over (B) the acquisition indebtedness with respect to such assets").

[110]　20 Pa.C.S. § 8113(c)(1).

the principal.[111]   Because the PFR and Section 8113 both require income to be determined in terms of the total value of the trust, Section 8113 offers no relative protection of the "real value" of the principal.  The flexibility afforded by Section 8113 to derive a return from the appreciation of capital or earnings already has been accomplished by the PFR.  The Joint Statement accompanying the enactment of Section 8113 explained that Section 8113 would only apply to charitable trusts that are not private foundations because "charitable trusts that are private foundations for Federal income tax purposes already have the ability to expend 'principal'" as income.[112]

Even if the Foundation was correct that the application of the PFR limits investment flexibility, this would hardly be an irrational or excessive burden to consider under Section 7740.3(e).  The total returns distribution rate under the Foundation's endowment is less than the mandatory five percent required by the PFR, highlighting why Congress sought to impose the mandatory distribution as part of the Tax Reform Act of 1969.[113]  Congress sought to force donated funds into the charitable stream more quickly by requiring all private foundations to distribute their income annually in amounts at least equal to a specified percentage.[114]  The mandatory five percent distribution has become the standard spending rate for private foundations.  By contrast, public charities sometimes

---

[111]   *Compare id.* ("If an election is made to be governed by this section, the term 'income' shall mean a percentage of the value of the trust."), *with* 26 U.S.C. § 4942(e)(1)(A) (providing that the "minimum investment return for any private foundation for any taxable year is 5 percent" of the "aggregate fair market value of all assets of the foundation").

[112]   20 Pa.C.S. § 8113 cmt. (Joint State Gov't Comm'n 2001).

[113]   *See* Foundation's Motion for Summary Judgment at 8 (stating that the Foundation's distribution rate is 4.6% of the endowment's total value).

[114]   *See* Fishman, *The Private Foundation Rules*, 17 Pitt. Tax. Rev. at 259.

"hoard money at the expense of the beneficiaries of their charitable mission."[115] The Foundation's sizeable endowment and distribution rate is in line with "immense billion-dollar endowments at some colleges and universities that have average spend rates of 4.6 percent, a figure below the private foundation mandate."[116] The PFR require a higher distribution to the Foundation than the Foundation requires of itself.

Because the PFR ensure a steady distribution rate of five percent, we agree with PNC and the Commonwealth that they provide a benefit, not a burden, to the Foundation. Regardless of whether PNC makes an election under Section 8113, the distributions required by application of the PFR are not unreasonable burdens. If the Foundation believes that the mandatory distributions will degrade the long-term value of the Trust, then the Foundation is free to remedy this degradation through its own savings and investment strategy. In particular, to the extent that application of the PFR results in greater distributions to the Foundation, the Foundation is free to save and invest the difference as it chooses. The Wells Trust provided unrestricted distributions, leaving the Foundation free to spend its annual distribution or to add the surplus to its endowment and to invest the money accordingly. Because the PFR's mandatory distribution benefits the Foundation, it is not something to be considered on the "administrative expense or other burden" side of the scale.

The Foundation has conceded the reasonableness of PNC's fees and does not challenge these fees as a basis for termination on appeal.[117] Notwithstanding this

---

[115]    *Id.* at 285-86.

[116]    *Id.* at 286.

[117]    *See* Foundation's Br. at 14 (conceding that the Foundation is not challenging PNC's fees on appeal and that these fees would not be enough to warrant termination); *id.* at 26 (stating that PNC's fees are no longer at issue); *id.* at 39 (stating that PNC's fees are "not a basis for the [Foundation's] claim").

concession, the Foundation includes in its calculation of burdens that would be avoided with termination the $13,450 that the Wells Trust annually spends in management and custodial fees.

Trusts carry with them inherent costs and administrative burdens, most notably fees that are paid from the trust to the trustee. Wells accounted for the costs of trust administration by providing "reasonable" compensation to the corporate trustee.[118] "Compensation at levels that arise in a competitive market [is] presumed to be reasonable in the absence of compelling evidence to the contrary."[119] The Foundation has conceded that PNC's fees are reasonable and represent market rates, indicating that the fees are not out of proportion to the benefits the Trust provides. The Foundation has not argued that PNC is violating any fiduciary duty relating to the Trust. The trustee's fees are inherent to Wells' chosen method of distribution through a perpetual charitable trust. We cannot conclude that the trustee's fees are disproportionate to any charitable benefit when those fees are an inherent part of the operation of the trust as explicitly directed by Wells.[120] PNC's reasonable fees are not part of the weighing required by Section 7740.3(e) because reasonable fees cannot be unreasonably disproportionate.

By the Foundation's own calculations, the administrative expenses and burdens imposed upon the Wells Trust through the PFR is about $4,325 annually, which is the approximate amount of the annual excise tax. Although the Foundation speaks broadly

---

[118]    Amendment to Revocable Trust Agreement, 7/7/1965, at 6, Article I.C.3; R.R. at 38a.

[119]    20 Pa.C.S. § 7768(d).

[120]    *See Church of Little Flower v. U.S. Bank*, 979 N.E.2d 106, 112 (Ill. App. 2012) (Where the trustee's fees exceeded the distributions to two of three beneficiaries, termination was not appropriate because the trustee's fees were not "unanticipated or unintended," but were "brought about by the operation of the trust pursuant to [the settlor's] express instructions.").

of the "totality of the combined, deleterious impact on maximizing the Wells Trust's charitable purposes" that the PFR impose,[121] the Foundation has not quantified any other expense or burden in which the separate existence of the Trust results. We turn now to the Trust's charitable benefits.

The benefit side of the analysis considers the charitable benefits that result from the separate existence of the trust.[122] A charitable purpose "may be applied to almost anything that tends to promote the well-doing and well-being of social men where neither law nor public policy forbids."[123] The UTA provides that "[a] charitable trust may be created for the relief of poverty, the advancement of education or religion, the promotion of health, governmental or municipal purposes or other purposes the achievement of which is beneficial to the community."[124] The Wells Trust was created for the purpose of supporting higher education at Wells' alma mater through its endowment via the Foundation.

Trusts may achieve charitable benefits in terms of the distributions that are paid to beneficiaries. A charitable trust that extends in perpetuity provides a long-term, ongoing benefit to the beneficiary—a benefit that results from the separate existence of the trust and that would be unavailable with an outright gift. If VMI were to close its doors, then the trustee could invoke Section 7740.3(a) to save the trust, seeking to invoke *cy pres* "to fulfill as nearly as possible" Well's "charitable intention."[125] A transfer of assets to the beneficiary would provide no such protection.

---

[121]   Foundation's Reply Br. at 24.

[122]   *See* 20 Pa.C.S. § 7740.3(e).

[123]   *In re Thompson's Estate*, 127 A. 446, 448 (Pa. 1925) (internal citation omitted).

[124]   20 Pa.C.S. § 7735(a).

[125]   *Id.* § 7740.3(a).

From 2010 through 2020, the Foundation received $639,314 in distributions. During this time, the value of the trust principal increased by forty percent, from $1.5 million to more than $2.1 million. Between 2017 and 2019, the Foundation received an average annual distribution of $71,500, nearly six times the amount paid by the Trust in fees and taxes. The size of the trust indicates that it ought to be self-sustaining and productive for many years to come. The charitable benefits to the Foundation are substantial.[126]

Whether the burdens are unreasonably out of proportion to the charitable benefits or whether to terminate the trust in the face of such disproportion are both questions vested in the sound discretion of the orphans' court. The high standard imposed for judicial termination is fact-intensive. It requires a robust assessment of benefits and burdens and the exercise of considered judgment to ascertain whether the burdens are unreasonably excessive in light of the charitable benefits the trust provides.

Even if the Foundation demonstrated as a factual matter that there were burdens created by the separate existence of the Wells Trust that are unreasonably out of proportion to the charitable benefit, the General Assembly vested the orphans' court with the discretion not to terminate the Trust.[127] When the General Assembly has used the terms "shall" and "may" in the same section of a statute, it indicates its intent to treat some actions as mandatory and some actions as discretionary.[128] In Section 7740.3(a)(3) the

---

[126]   We reject the Foundation's argument that the unreasonably out of proportion standard requires the trust's expenses and burdens to be weighed against whether those individual expenses or burdens provide any charitable benefits. This is not what Section 7740.3(e) requires. The statute is not concerned with whether the burdens themselves confer any benefits. Rather, the standard looks at the expenses and burdens together and weighs them against the charitable benefits provided by the "separate existence of the trust." *Id.* § 7740.3(e).

[127]   *Id.* (providing that "the court may . . . terminate the trust").

[128]   *Lorino v. Workers' Comp. Appeal Bd.*, 266 A.3d 487, 493 (Pa. 2021).

General Assembly directed that the court "shall" apply *cy pres* under certain circumstances.[129]  By contrast, Subsections (c), (d), and (e) describe the circumstances under which a court "may" modify or terminate a trust.[130]  This design indicates legislative intent to make termination permissive, not mandatory.[131]  Reading Section 7740.3(e) in the context of the rest of Section 7740.3 demonstrates that this provision permits but does not require termination under the circumstances described therein.

The orphans' court's exercise of discretion will be evaluated under the abuse of discretion standard in light of the record.  "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous."[132]

The Concurring and Dissenting Opinion would remand for further proceedings in order to permit the orphans' court to exercise the discretion afforded by Section 7740.3(e).  A remand is not necessary, because the orphans' court already exercised this discretion.  That court determined that neither the charitable benefits nor the burdens warranted judicial termination.  The orphans' court found nothing about PNC's fees to be unreasonable and found that the Trust was not burdened by confusion, complexity, or

---

[129]     20 Pa.C.S. § 7740.3(a)(3).

[130]     *Id.* § 7740.3(c) ("A court may modify an administrative provision of a charitable trust to the extent necessary to preserve the trust."); *id.* § 7740.3(d) ("A trust solely for charitable purposes having assets of less than $100,000 may be terminated . . . ."); *id.* § 7740.3(e) (providing the circumstances under which the court "may" terminate a trust).

[131]     *See Zimmerman v. O'Bannon*, 442 A.2d 674, 678 (Pa. 1982) ("With such a scrupulous use of the terms 'may' and 'shall,' in the very subsection in question, it is clear that the inclusion of 'shall' when referring to the obligation of the court to grant the requested stay was intended to convey the lack of the court's discretion in that decision.").

[132]     *Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1046 (Pa. 2003).

contradiction.[133] Weighing the burdens and benefits, the orphans' court held that the Trust's fees and expenses were not unreasonably out of proportion to the charitable benefit.[134] The record demonstrates compellingly that the Trust's expenses and burdens are not unreasonably out of proportion to the charitable benefits by any measure, and that the orphans' court did not abuse its discretion.

The approximately $4,325 that the Wells Trust will pay out annually in excise taxes is weighed against the charitable benefit of approximately $71,500 in annual distributions to the Foundation, as well as the likelihood that the value of the Trust will continue to increase under PNC's management and to provide long-term distributions. Consideration of PNC's reasonable compensation does not change this analysis, because reasonable fees are not irrationally excessive when compared to the charitable benefits. Individually or in the aggregate, none of the modest burdens imposed because of the Trust's status as a private foundation are unreasonably out of proportion to the charitable benefit. Because the Foundation did not meet its burden, there was no basis under Section 7740.3(e) for the orphans' court to set aside Wells' intent to continue the Trust or for this court to intrude upon the orphans' court's exercise of discretion in this regard.

The General Assembly has considered the circumstances warranting judicial termination of a charitable trust and has not determined that termination is warranted simply because it is to the advantage of beneficiaries. The predecessor of Section 7740.3 was Section 6110. Section 6110(b) authorized the administrative termination of small charitable trusts with assets under $10,000, and Section 6110(c) authorized the judicial

---

[133]    *See* Tr. Ct. Op., 9/30/2021, at 7.

[134]    *See* Tr. Ct. Op. 12/28/2021 at 2.

termination of trusts in language virtually identical to Section 7740.3(e).[135]  Subsections (b) and (c) were added in 1982 "to allow for the termination of trusts where the amount of the principal or *complexity of duties imposed upon the trustee* makes continuance of the trust impractical."[136]  The 1982 comment indicates that the administrative expenses and other burdens that the court is required to weigh against the charitable benefits are those that are borne by the trustee in administering the trust and that bear upon the complexity of duties imposed by the trust.  There is no indication that the General Assembly was concerned with whether the beneficiary could achieve more investment flexibility by virtue of its distinct tax treatment or whether the beneficiary enjoyed a financial relationship with another corporation that could result in less compensation to the trustee.  Termination was intended to free the trustee of the obligation of meeting complex administrative expenses and burdens.

---

[135]    Section 6110(c) provided:

> (c) Judicial termination of charitable trusts.--If the separate existence of a trust solely for charitable purposes, whether heretofore or hereafter created, results or will result in administrative expense or other burdens unreasonably out of proportion to the charitable benefits, the court may, upon application of the trustee or any interested person and after notice to the Attorney General, terminate the trust, either at its inception or at any time thereafter, and award the assets outright, free of the trust, to the charitable organizations, if any, designated in the conveyance, or if none, to charitable organizations selected by the court, in either case for such purposes and on such terms as the court may direct to fulfill as nearly as possible the conveyor's intentions other than any intent to continue the trust, if the court is satisfied that the charitable organizations will properly use or administer the assets.

20 Pa.C.S. § 6110(c) (repealed 2006).

[136]    20 Pa.C.S. § 6110 (repealed 2006) cmt. (Joint State Gov't Comm'n 1982) (emphasis added).

Termination "merely because [it] would be more advantageous to the beneficiaries" is inappropriate.[137]   The Foundation has not provided precedential support from this Commonwealth or elsewhere showing that beneficiaries may obtain termination simply because they believe that they can manage the assets more efficiently.   The absence of precedent supporting the ability of beneficiaries to terminate the trust and to obtain the assets outright over objection by other interested parties or the Attorney General indicates that these circumstances are unusual and not those at which Section 7740.3.(e) is directed.   The Foundation's request is, quite literally, unprecedented.

In one of the few cases invoking judicial termination of a charitable trust, an Illinois appellate court reversed the trial court's grant of a beneficiary's request to terminate a trust and to distribute assets to the beneficiaries.   In *Church of Little Flower v. U.S. Bank*,[138] a beneficiary, with the consent of the other two beneficiaries and the state's Attorney General, sought judicial termination under the doctrine of equitable deviation due to the trustee's fees, which the beneficiary alleged were too high in relation to the distributions, a scenario the beneficiary believed to be the result of the PFR.   According to the court, termination would be warranted only if the trust was "so inefficient that its continuation would necessarily interfere with the trust's purpose."[139]   That standard was not met by virtue of the trust's status as a private foundation.   Even if the application of the PFR was an unforeseen circumstance, the PFR's mandatory distribution exceeded

---

[137]   RESTATEMENT (SECOND) OF TRS., § 167 cmt. b (AM. LAW. INST. 1959); s*ee In re Trust of Mintz*, 282 A.2d 295, 301 (Pa. 1971) (citing Section 167 with approval); *Appeal of Gannon,* 631 A.2d 176, 188 (Pa. Super. 1993) (same); *see also Estate of Weeks*, 402 A.2d 657, 658 (Pa. 1979) (endorsing the view expressed by the Restatement (2d) of Trusts on the question of whether a trust may be terminated without the consent of the settlor).

[138]   979 N.E.2d 106 (Ill. App. Ct. 2012).

[139]   *Id.* at 113.

the distributions required under the trust without the PFR and operated to the benefit of the beneficiaries.[140]

We agree with the Illinois appellate court that it would be "inappropriate" to terminate a trust because of its status as a private foundation.[141] The Foundation offers no basis to distinguish the Wells Trust from every other private foundation subject to the PFR, suggesting that every charitable trust would be subject to termination simply because of its status as a private foundation.

The PFR's "burdens" have applied to all private foundations since 1969. The General Assembly is well aware of the PFR and has legislated on this subject matter in the Charitable Instruments Act.[142] If the General Assembly believed these burdens to be unreasonably out of proportion to charitable benefits and categorically to warrant termination, it could have authorized the judicial termination of any charitable trust classified as a private foundation. Other legislatures have done as much.[143] Rather than permit the termination of all private foundation trusts, the General Assembly chose to enact the fact-specific and high standard of Section 7740.3(e).

The standard of Section 7740.3(e) contrasts with the categorical termination for small charitable trusts in Section 7740.3(d), which demonstrates the General Assembly's

---

[140] *Id.* at 112 ("Under the private foundation rules, the total distributions to the charities from 2006 through 2010 actually exceeded the trust's income. That is, if not for the operation of [the PFR], plaintiff would have received even less money.").

[141] *Id.*

[142] *See* 20 Pa.C.S. § 7903(a)(1) (providing that "[t]he governing instrument of a charitable organization is deemed to include provisions" requiring distributions under the PFR).

[143] *See, e.g.*, MICH. COMP. LAWS § 14.285 (1971) (providing that "a private foundation trust" may terminate with the consent of the attorney general under certain conditions and without the attorney general's consent "with consent of a court of competent jurisdiction in an action to which the attorney general is an indispensable party").

willingness to authorize termination on a categorical basis when it wants to do so. It follows that Section 7740.3(e) does not authorize termination simply because the Trust is a private foundation. Being subject to the PFR is not the fulcrum upon which termination depends.

Contrary to the Foundation's argument, *Schlegel* is distinguishable on its facts. There, the trustee sought termination of a private foundation with the support of the Attorney General.[144] The Schlegel trust had encountered difficulty with fulfilling the trust's charitable purpose. That is not the case here, where the Wells Trust is providing considerable charitable benefits. The unopposed termination ordered in *Schlegel* does not support the Foundation's termination in this case.

We presume that a settlor understands the costs inherent in creating a trust, such as the costs of an independent trustee and any tax consequences. We know from the record that Mr. Wells certainly was aware of these expenses, as he directed the payment of reasonable trustee fees from the Trust. Trusts typically have expenses. It will almost always be the case that it costs less to give an outright gift than it does to administer a trust. A gift is made and is done, whereas a trust such as the Wells Trust extends into perpetuity and requires administration for the duration of its existence. Simply comparing the expenses involved in a gift versus the expenses involved in administering a trust is not sufficient to establish the unreasonably disproportionate standard of Section 7740.3(d). Otherwise, all trusts would be subject to termination. Whatever savings may result from terminating a trust and awarding the assets to the beneficiary outright are not relevant under Section 7740.3. Although the Foundation believes that it could manage the trust assets better than PNC has done, it is the trustee, not the beneficiary, who

---

[144]   2003 WL 26100147, at *1.

administers the trust. It is the trust document, not the Foundation's preference, that controls the terms of the trust.

The General Assembly has accounted for the interest of the settlor in continuing the trust by enacting a heightened standard for the termination of that trust. The plain language of the statute protects this intent by ensuring that termination may be permitted only when the administrative expenses and burdens are unreasonably out of proportion to the trust's charitable benefit. To the extent that the Foundation believes termination to be warranted because Wells never anticipated that the trust would be subject to the PFR, an examination of what the settlor may have anticipated is another way of addressing what the settlor may have intended. And, like the consideration of the settlor's intent to create a trust, what the settlor anticipated with respect to the trust is not relevant as an independent consideration under Section 7740.3(e). The General Assembly knows how to account for unanticipated circumstances and how they relate to trust termination, as it has authorized the termination of a noncharitable trust due to unanticipated circumstances.[145] The General Assembly decided to exclude unanticipated circumstances as a basis to terminate charitable trusts.

The Concurring and Dissenting Opinion likewise believes that the issue of whether "a settlor's intentions to benefit a beneficiary in a particular manner may have been affected by unforeseen changes"[146] is generally relevant to a determination under Section 7740.3(e). In this case, the Concurring and Dissenting Opinion believes that "a change in the law after Settlor's death affecting the Trust in ways he could not anticipate" is one of several facts that may preclude summary judgment for PNC and the Commonwealth.[147]

---

[145]   20 Pa.C.S. § 7740.2(a).

[146]   Concurring and Dissenting Op. at 2.

[147]   *Id.*

The impact of unforeseen changes or unanticipated circumstances in the law is not relevant to the termination of charitable trusts, by the design of the General Assembly. Although Section 412 of the UTC would permit termination of charitable and noncharitable trusts alike due to "circumstances not anticipated by the settlor,"[148] our General Assembly chose to limit this remedy to noncharitable trusts.[149] For charitable trusts, the ability to account for unanticipated circumstances is limited to the doctrine of *cy pres* as codified in Section 7740.3(a). Unforeseen changes are not relevant to judicial termination under Section 7740.3(e).

The Concurring and Dissenting Opinion further opines that there are specific facts in this case which, taken in the light most favorable to the Foundation, do not entitle PNC and the Commonwealth to relief as a matter of law.[150] Facts that are implicated under the plain language of Section 7740.3(e) are those that go to the trust's burdens and charitable benefits. Reading the facts of this case in the light most favorable to the Foundation does not change the analysis required by Section 7740.3(e) and applied above.

Wells carefully constructed his trust to provide for certain named beneficiaries and to leave a substantial estate to benefit the Foundation. Wells sought to commemorate his gift in the honor of his graduating class, and he accounted for an independent corporate trustee. Absent an impediment that causes the burdens of the trust to grow unreasonably out of proportion to the charitable benefit, the assets that the Foundation seeks must continue in trust.

The order of the Superior Court is affirmed.

---

[148]    UNIF. TR. CODE § 412(a).

[149]    *Compare* 20 Pa.C.S. § 7740.2(a) *with id.*, § 7740.3.

[150]    Concurring and Dissenting Op. at 2.

Chief Justice Todd and Justices Donohue, Dougherty and Brobson join the opinion.

Justice Mundy files a concurring and dissenting opinion.